## Markle *v.* Wilbur et al., Appellants (No. 1).

200   457
f200 473

*Partnership—Management of partnership affairs—Equity.*

Where a partnership consists of more than two persons, the majority acting fairly and in good faith may direct the conduct of its affairs as long as they keep within the purpose and scope of the partnership. In such a case the minority must yield, so long as the majority do not transcend or pervert the powers with which the firm has been invested.

A partnership consisting of seven persons was organized to conduct the

business of mining coal. The shares were divided into sixteenths, and the term of the partnership was for twenty years. On a bill in equity by two of the partners representing three and one half sixteenths against the other partners for an account, it appeared that one of the plaintiffs was a woman, and the other was engaged in banking in a distant state. Three of the defendants were practical men in the coal business and one of them who acted as manager or superintendent was an educated mining engineer of large experience in his profession. The evidence showed no bad faith or fraud in the management of the business. The plaintiffs claimed that the defendants should account for a very large expenditure on a tunnel over a mile long, for the cost of a dwelling house for the superintendent, for a salary of $10,000 a year of an assistant superintendent, and for various other matters of expenditure. The evidence showed that the large expenditure for the tunnel was due to unforeseen conditions in the strata, impossible to determine beforehand; that the house was occupied by the superintendent who paid an annual rental which equaled·six per cent of its cost. As to other items explanation was made tending to show that they were necessary to carry on the business successfully and for a profit. *Held*, that the defendants were under no duty to account.

*Partnership—Sale of interest—Exclusion of partner.*

Where partnership articles provide that a partner may sell his interest to another partner without a dissolution of the firm, and one partner sells his interest to another, but stipulates that he shall retain title to the interest until it is paid for, the other partners cannot object to the vendor continuing to participate in the management of the business, if the vendee does not object.

Argued April 10, 1900. Appeal, No. 25, Jan. T., 1900, by defendants, from decree of C. P. Luzerne Co., Oct. T., 1895, No. 14, on bill in equity in case of George B. Markle, Alvan Markle and Clora Markle v. E. P. Wilbur, John Dreisbach, William H. Stroh and E. S. Twining, Executors of William Lilly, Deceased, John Markle, Ida Hessenbruch and Herman Hessenbruch, her Husband. Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for an account of the affairs of the firm of George B. Markle & Co.

The affairs of this firm have been previously considered in the following cases: Barber's Appeal, 182 Pa. 378; Hessenbruch's Appeal, 182 Pa. 393; Markle's Estate, 187 Pa. 639; Hessenbruch v. Markle, 194 Pa. 581.

The facts of the present case are stated at length in the opinion of the Supreme Court.

LYNCH, J., entered the following decree:

This case came on to be heard, and after argument of counsel and full investigation, now January 8, 1900, it is ordered, adjudged and decreed:

1. That the above named plaintiffs are entitled to an account of the several matters contained in the bill as therein prayed; and that a master be appointed by this court to state such account in detail together with a full account of the liabilities of the firm of George B. Markle & Company the amount of the assets thereof and the full amount of profits of the said firm from all sources from the first day of January, 1890, to the date of accounting, and when so ascertained the master shall report to the court a schedule of distribution of such of the net profits and earnings of the firm thus ascertained as are not necessary for the current business thereof to and among the several parties interested therein in the proportions to which they may be entitled.

2. And to the intent and purpose that a proper account may be stated by the said master the defendants and any manager, employee, agent, depository, or superintendent of them or any of them, or of said firm, are hereby enjoined from paying out any of the earnings of said firm by way of dividends, or partial distributions of earnings of the firm on special deposit or otherwise pending the account; and they are further commanded to render unto plaintiffs a true account of all earnings of said firm including any now on special deposit to be included in the master's schedule of distribution.

3. It is further ordered, adjudged and decreed that the defendants, E. P. Wilbur, John Markle, Ida M. Hessenbruch, and Herman Hessenbruch, her husband, John Driesbach and Edgar Twining, surviving executors of William Lilly, deceased, be enjoined from excluding the plaintiffs, George B. Markle, Clora Markle and Alvan Markle from participating in the management of the said firm, and from interfering with the plaintiffs in receiving their just share of all the net profits of the firm which they may now or hereafter be entitled to receive as partners.

4. It is further ordered and decreed that unless the property now held by the Jeddo Tunnel Company, Limited, be transferred to the firm of George B. Markle & Company within

ninety days from the date of this decree, that the defendants account to said firm of George B. Markle & Company for the entire amount loaned by the defendants out of the assets of the said firm of George B. Markle & Company to said Jeddo Tunnel Company, Limited, within ninety days from the date of this decree.

5. It is further ordered, adjudged and decreed that the defendants, E. P. Wilbur, John Markle, Ida M. Hessenbruch, John Driesbach and Edgar Twining, surviving executors of William Lilly, deceased, and any clerk, agent, manager or superintendent whom they or any of them may select be enjoined from expending the profits of the firm in any permanent improvements on the property of the firm and from impounding and holding the profits of the firm of George B. Markle & Company for the contemplated permanent improvements of the firm property as set forth in the bill without the consent of the plaintiffs, George B. Markle, Alvan Markle and Clora Markle.

*Error assigned* was the decree of the court.

*Samuel Dickson* and *Henry W. Palmer*, for John Markle, appellant.

*F. W. Wheaton*, for E. P. Wilbur, appellant.

*W. G. Freyman* for J. M. Dreisbach and Edgar Twining, surviving executors of William Lilly, appellant.

*John G. Johnson*, for Ida M. Hessenbruch and Herman Hessenbruch appellants.

*George Wharton Pepper*, with him *D. L. Rhone* and *J. Q. Creveling*, for appellees.

OPINION BY MR. JUSTICE DEAN, October 11, 1901 :

We have before us in this case the paper-books; appellants' alone contains 709 pages of printed testimony and exhibits ; there are besides appellees' paper-book, and supplements on both sides. To make an intelligent decree involved a most thorough examination of all this testimony, of the papers and witnesses.

We may note, first, that Alvan Markle is no longer a party plaintiff. After the testimony was all in, and before the court below considered it, he withdrew, substantially, acknowledging he had been mistaken in his complaint; then when the decree he had joined in asking for was entered, he appealed from it. Further, appellants aver that George B. Markle, one of the two remaining plaintiffs, has no standing as a party, because his interest as a partner had become vested in his two sisters, Clora Markle, plaintiff, and Ida Hessenbruch, one of the defendants. As to the issue raised by this objection, it is not material in this case; the whole question was considered and finally decided in Hessenbruch v. George B. Markle, 194 Pa. 581. Although that case was a close one and the court by no means of one mind, we adhere to that decision and will not "thresh that old straw over again;" it would profit neither side to this appeal. Besides, no one questions that Clora Markle became the equitable if not the absolute owner of the moiety of her brother, George, by assignment from him, so that, he could properly appear as a party, if she made no objection, to urge the enhancement of the value of her interest held in pledge before and advocate her complaint as against her copartners, these defendants.

The bill sets forth that on December 30, 1889, the plaintiffs entered into partnership with John Markle, William Lilly, E. P. Wilbur and Ida Markle, for the purpose of mining coal upon lands held by the firm under lease from the Union Improvement Company, for thirty years from January 1, 1890, and from the Highland Coal Company, for thirty years from January 1, 1892, the interests of the partners being as follows: William Lilly, six thirty-seconds; E. P. Wilbur, twelve thirty-seconds; John Markle, four thirty-seconds; J. B. Markle, four thirty-seconds; Clora Markle, one thirty-second; Ida Markle, one thirty-second. The partnership was to begin January 1, 1890, and to continue to January 1, 1920. Any partner might sell his interest to any of the remaining members of the firm, but not to a third person without written consent. Assignment was not to work a dissolution, and in case of death the executors were to represent the estate. While John Markle gave his personal attention and so long as his management should

be satisfactory to all interests, he was to be allowed a salary of $15,000 per annum.

2. On the death of William Lilly, his executors took his place.

3. On October 19, 1894, E. P. Wilbur sold his interest to John Markle, but persisted in attending the meetings and voted, and otherwise fraudulently intermeddled.

4. That E. P. Wilbur conspired with the other defendants so as to exclude the plaintiffs, and in particular resolved that they should only recognize John Markle as authorized to conduct the mining and selling of coal, the deposits of moneys, the drawing of checks, and the execution of contracts.

5. That it was agreed at the time of the execution of the articles that John Markle would not act as manager, unless his management should be satisfactory to all interests, but against protests he continues to do so, his management being unsatisfactory.

6. As a more specific statement of gross mismanagement by John Markle, the plaintiffs say :

That he declared and paid out a dividend of $60,000, although the firm was indebted to William Lilly and others in the amount of $80,000.   In further pursuance of his evil and corrupt purposes, he employed an assistant, W. H. Smith, Jr., and secretly paid him a salary of $10,000 a year.   That in further pursuance of the conspiracy to defraud, he neglected and refused to accept pay for coal sold to the Lehigh Valley Coal Company; and that he made grossly inaccurate statements and plaintiffs had no means of finding the true account.   That John Markle and his associates built a tunnel known as the Jeddo tunnel, of which they could get no true accounts, and built another tunnel which the plaintiffs thought was worthless, but the true cost of which was unknown.   That he built a house for himself at Jeddo, at a cost of $16,000, which he paid for out of the current fund.   That he made grossly inaccurate statements of the net earnings.   That the books had been kept at Jeddo exclusively by John Markle and his clerks ; that they could only have access to them under espionage.   That no meeting of the members of the firm had been called.   That John Markle had pledged to Drexel & Company security to indemnify Drexel & Company against his unlawful acts.   The bill further alleges,

that John Markle is about to embark in extensive permanent improvements, which were unnecessary. The leases provided that the lessee should not transfer or assign them without the written consent of the lessor, and hence a dissolution of the firm is impossible. All the acts were a part of a plan to wholly exclude the plaintiffs from participation in the partnership management.

The prayers were:

For an injunction on defendants as follows:

To restrain Wilbur from voting or intermeddling; the defendants from excluding the plaintiffs; John Markle from acting as general superintendent, to the exclusion of the plaintiffs; the defendants from embarking in any extension of the mines, or the erection of any new breakers or machine shops, or other means of preparing or shipping coal; the defendants from paying out any money of the firm by way of dividend earnings or profits without the consent of the plaintiffs. Further, that the defendant be ordered to account for the cost of the Jeddo tunnel and to pay the plaintiffs their share of the excessive cost, and the entire cost of Tunnel B and all other unnecessary improvements. That John Markle be compelled to account for the salary of Smith, paying the plaintiffs their share. That John Markle be compelled to account for and pay the share of the cost of the house. That the defendants be compelled to truly account for coal sold. That they be compelled to truly account for all profits from all sources. That a master be appointed. Further relief.

The principal answer is that of John Markle, which is substantially adopted by the other members of the firm. It gives a history of the firm from its original organization, November 30, 1876, by George B. Markle, plaintiffs' ancestor, William Lilly and Asa Packer, and quotes the provisions of the will of George B. Markle relating to the business of the firm of George B. Markle & Company. It next avers that in November, 1880, John Markle was put in charge of the mining interests of the firm by his father, with the consent of the copartners. That the conduct of the business has been largely left to himself by Mr. Wilbur and by General Lilly, in his lifetime, and by his executors after his death. A controversy having arisen between John and his brothers, the latter and Clora Markle had at-

tempted to interfere with the conduct of the business, but all
the other interests sustained his management. George B. Markle
had assigned his interest to his sisters and had little, if any,
interest in the business. It admits that Mr. Wilbur entered
into an agreement to sell his imterest, but alleges that final
settlement had not been made and that he was entitled to retain
his rights until then. It denies conspiracy or agreement to
exclude the plaintiffs from the management, except as contem-
plated in the articles of partnership, alleging that the majority
in interest had a right to govern. It denies that he agreed to
act as manager only so long as satisfactory to all, and alleges
that at the formation of the firm, it was understood by all,
that he was to have control and direction of the business, as
it would be impossible for the other partners to find time to
take any active part. George B. Markle was engaged in bank-
ing in Portland, Oregon ; Alvan Markle, in banking in Hazle-
ton.

Quotes letters, recommending distributions which were made
without objection, except as to the share of George B. Markle.
States that indebtedness to William Lilly was under an arrange-
ment for monthly repayment of a debt of $10,000, and that
there was no default to Lilly or Lehigh Valley Coal Company.
Denies that payments to Smith were secretly made and alleges
that they were entered on the books as other like payments.
Denies allegations as to Lehigh Valley Coal Company and says
that the plan pursued was the same as in force since the firm
was formed. The amount left on deposit was reasonable, and
books and papers at the office at Jeddo were always open to
examination of plaintiffs or their authorized representatives.
Denies that statements were inaccurate and alleges that plain-
tiffs had in their possession the information to reconcile ap-
parent differences in the two sets of statements rendered, and
explains the same. Avers that the Jeddo tunnel was built in
compliance with the conditions of the lease, and that the Tunnel
B was also necessary, and that George B. Markle and Alvan
Markle knew all about it. Admits building house, but says it
was done with the consent and approval of the majority in in-
terest. Denies having made inaccurate statements and avers
that detailed statements were submitted, and explains mistake
of plaintiffs in assuming otherwise. Says that plaintiffs al-

ways had access to the books and assistance of the bookkeepers and expert accountants employed by them, and were given free access. Admits that it was not the custom of the firm to hold meetings, and those called by the plaintiffs were not held at the office of the firm. Explains the giving of the bond of indemnity to Drexel & Company, and states that if it had not been done, money could not have been had to pay the wages.

Admits that certain improvements were under consideration, but says that no others will be undertaken without consultation.

Avers that partners representing the majority in interest were acting in good faith, without any purpose to exclude the plaintiffs, but that there could only be one general manager. Avers that in view of the misconduct of the plaintiffs, they should be enjoined, or dissolution decreed.

It will be noticed that the answers are responsive to the bill and deny every material complaint; the burden was, then, on the plaintiffs to sustain their complaint by proper proofs. We may say at the outstart, that we fail to find any evidence of dishonesty, bad faith, conspiracy, or overreaching by defendants or any one of them ; there may have been mistakes of judgment in planning and conducting the business, but there was no unfairness or dishonesty. The plaintiffs, if they get such relief as they ask, must get it because of gross mismanagement of the partnership business, or because of wholly unauthorized acts in conducting the business.

We do not understand, that the court below found as a fact, that defendants in any instance acted in bad faith toward their copartners, but it does find that they expended the partnership money extravagantly, and without authority in improvements and salaries against the protest of the minority. The substance of its findings of facts and conclusions of law on which the decree is based are contained in its conclusions of law, one to four inclusive, as follows:

" 1. That E. P. Wilbur has not been a member of the firm of G. B. Markle & Company, since the 25th day of October, 1894, and that his participation in the business of said firm as a member since that date has been illegal and unwarranted, and that he must be restrained from further acting as a member of said firm.

· " 2. That since the 19th day of October, 1892, John Markle had no authority to act as general superintendent and manager of the firm, to the exclusion of other members of the firm, and that his assumption of the position of general superintendent and manager of the firm of G. B. Markle & Company, since that date, has been illegal and unwarranted.

" 3. That a majority of the members of the firm of G. B. Markle & Company were and are vested with the power, after meeting ' bona fide, ' to consult upon business of the firm, to do all those things necessary for successfully carrying on the business contemplated in the articles of copartnership; but they have not the power under the articles of copartnership to make permanent improvements to the property ; nor to establish a surplus fund for the purpose of making future improvements ; nor to establish an insurance fund; nor to build a house for one of their members ; nor to employ clerks at excessive salaries to act as assistant superintendents ; nor to do any other act not contemplated in the articles of copartnership and necessary for the successful operation of the ordinary business of the firm, without the consent and against the protest of the minority of the members.

" 4. That all the partners in a partnership like the one in question have an equal voice and power in the management of all the affairs of the concern, without regard to the amount of interest either one may have in the capital of the concern ; and no mere majority in interest can be recognized, as having any power over those representing a minority in interest in the concern."

It is not necessary to follow the specifications in detail from fifth to twelfth inclusive, wherein the learned judge undertakes to show that the defendants, and especially John Markle, acted in excess of their authority as partners and must, therefore, account to plaintiffs for all expenditure of money not expressly authorized by all the partners. If such expenditure was wholly and palpably unauthorized, it may be, that the decree could be sustained; but this brings us at once to the question, what under articles of copartnership such as these, and the nature of the partnership business, can be lawfully done by a majority of the partners, acting in good faith, in their best judgment, for the promotion of the partnership interests ?

As we have already noticed, there are in fact at most, but two of the partners here complaining, George B. Markle and Clora Markle; and at most, between them, they owned but a three and one half sixteenths interest; twelve and one half sixteenths belonged in different proportions to defendants. Alvan Markle, by withdrawing as plaintiff before the consideration of the evidence, and joining with defendants, approved and ratified all the acts of which he had previously complained in the bill.

The fact that E. P. Wilbur sold his interest to John Markle, yet afterwards continued to act as a partner, is not very material, for it did not change the majority in value or numbers. In his sale to Markle, Mr. Wilbur stipulated, that he should retain title to the interest until it was paid for. It was not paid for while he acted as a partner, under the terms of this sale. Wilbur, still holding a legal title, his vendee, John Markle, was the only proper party to object, and he did not do so. Therefore, in any view of the evidence, the management, good or bad, was expressly authorized or subsequently ratified by a very large majority of the partners in number and value. A very small minority, these two complainants, must now be treated as objecting. The court below, in its third conclusion of law, says: "A majority of the members . . . . may do all those things necessary for successfully carrying on the business contemplated in the articles of copartnership;" but this correct enunciation of the law is neutralized by that part of his conclusion immediately following it, when he says: "But they have not the power to make permanent improvements, nor to establish a surplus fund for future improvements, nor to build a house, nor to employ clerks at excessive salaries, nor to employ an assistant superintendent, nor to do any other act not necessary for the ordinary business operations of the firm, without the consent of the minority members."

But who determines whether the particular act complained of is necessary for the successful carrying on of the copartnership? If, on a mere complaint and non-assent of the minority, there is no power in the majority, then, the minority, in effect, carries on the partnership. If it is determined by the court on conflicting evidence, then the court carries it on. This is not

the law.  The rule laid down in Story on Partnership, section 123, is stated thus :

" But another question may arise, and that is, whether, in case of partnership, the majority is to govern in case of a diversity of opinion between the partners as to the partnership business and the conduct thereof, or whether one partner can, by his dissent, arrest the partnership business, or suspend the ordinary powers and authority of the other partners in relation thereto, against the will of the majority, where there is no stipulation in the partnership articles to control or vary the result ; (for if there be any stipulation that ought to govern) ; the general rule would seem to be, that each partner has an equal voice, however unequal the shares of the respective parties may be ; and the majority, acting fairly and ' bona fide,' have the right and authority to conduct the partnership business within the true scope thereof, and dispose of the partnership property, notwithstanding the dissent of the minority."

Then our own view of the law as stated by our late Brother WILLIAMS, in Clarke v. Slate Valley Railroad Company, 136 Pa. 408, is as follows :

" This leads us to consider the manner in which the business of a firm must be conducted.  The firm must have its origin in the mutual confidence reposed by the persons who comprise it, in each other's skill, integrity and capacity.  Its members are bound by the nature of their compact to the exercise of good faith towards each other and the common enterprise for which they have united.  Differences of opinion about questions of administration are to be anticipated.

" It would be unreasonable to expect that all members of a partnership should see ailke upon all questions, and, for that reason a mere difference of opinion about the best thing to do, or the best way of doing it, does not necessarily work a dissolution, or send the business and assets of the firm to a receiver. It was the rule of the common law that the contracts of partnership must be governed, like other agreements, by the principles of natural law and justice.  It has accordingly been held that, where a firm consists of more than two persons, the majority, acting fairly and in good faith, may direct the conduct of its affairs as long as they keep within the purpose and scope of the partnership: 2 Bouvier's Inst. sec. 1454 ; Story on Part.

sec. 123.   In such case, the minority must yield, so long as the majority do not transcend or pervert the powers with which the firm has been invested.   If the number of partners should in any given case be an even number and they should be evenly divided in opinion, with no provision for such a contingency in their articles, then it may be that, as to that subject, the power of the firm to act is suspended so long as the even division continues ; and, if the subject be one upon which action is essential to the purposes of the partnership, such disagreement might work a dissolution by rendering the further prosecution of the common enterprise impossible.   The same consequences could not flow, however, from the dissent of a minority, because, within the purpose of the partnership and for the promotion of its interests, the majority have the right to control."

. John Markle was appointed superintendent or manager in the articles of copartnership, at a salary of $15,000, and continued till October, 1892, when the plaintiffs gave notice that they were dissatisfied with his management.   He, from that time, ceased to draw his salary, but continued in the management the same as before.   He is an educated mining engineer, of large experience, and had the full confidence of his father, who for many years was a large coal operator in that region. During the five years, 1890 to 1894, inclusive, the partnership made large profits, over $1,000,000.   Of this, forty per centum of the capital invested was paid out in dividends to the partners and part of the balance was expended in improvements, and part set aside as a fund to meet contingencies such as insurance and depreciation in the value of machinery, and so forth.   E. P. Wilbur had been in the coal business all his life and was active as a consulting partner.   General Lilly while he lived, was active in consultation and advice, and two of his executors after his death.

These partners of large experience, joined by Mrs. Hessenbruch, and now also by Alvan Markle, owners of all but a small fraction of the capital, were of the opinion, that the Jeddo Tunnel should be constructed, because it was necessary if the business of the partnership was to be conducted at a profit. This business, by the terms of the articles, was to continue twenty years.   This tunnel, over a mile long, cost over $200,000 much more than the original estimate, owing to impossible to

be foreseen conditions in the strata penetrated. A dwelling house for the superintendent, costing $16,000, was erected, on which John paid an annual rental equal to six per cent of its cost. An assistant superintendent, at a salary of $10,000 was employed. It is alleged that this last amount is excessive and that defendants must account for and pay over the excess. That the setting aside of an insurance fund without consent of plaintiff was illegal. And so with other items of expenditure; the court directs that defendants shall account for all of them and pay over to plaintiffs their share.

The fault we find with the learned judge's conclusion is, that it does not follow the premise laid down by him. He concedes, that a majority of the members of the firm had the power, if they acted bona fide, to do all those things necessary for successfully carrying on the business contemplated in the articles of copartnership. He does not intimate that they acted mala fides, nevertheless, having acted in good faith according to their honest judgment as to the necessity of the expenditures, he imposes upon them the most severe penalty. He could not have made it more severe if he had found they had acted in bad faith, or had grossly and wilfully mismanaged the partnership affairs. He acts on his own judgment, as to how the property has been managed, and wholly disregards the judgment of the partnership; this, too, long after the event when the exercise of foresight is no longer required. It is plain that the Jeddo tunnel cost more money than it would have cost if its projectors could have seen thousands of feet into the mountain through which it was dug, before they determined its dimensions; but they planned it with the best skill and light they had; after proceeding a considerable distance, they found entirely different conditions from what they had been led to expect and were compelled to greatly change their plans. This was a costly mistake, the consequence of a want of knowledge, which no human power could have given them before the commencement of the work, but which certainly subjects them to no penalty for a mere ignorance which they could not dispel. And the same may be said of all their other acts complained of.

But, if they acted in good faith, yet lacked authority, either express or implied in the articles of copartnership, the learned judge decides they must account. This interpretation of articles

of copartnership to produce and market annually many thousands of tons of coal during a period running through many years, is entirely too narrow.   It is the interpretation put by jurists upon the federal constitution, " whatever power is not expressly granted is withheld."   But it was error to put that interpretation upon articles such as these, applicable to a business such as this; rather the interpretation should be, that whatever power is necessary to a profitable transaction of the business is impliedly given to the partnership, and as the authorities cited show, the action in good faith of a majority of the partners is that of the partnership.   The learned judge holds, that the partnership had no authority to make a permanent improvement; but who should decide what is a permanent improvement?   No doubt the Jeddo tunnel, and other tunnels, were permanent, in that, they would remain there after the termination of the partnership; and the superintendent's house would also remain; they could not remove the tunnel or the house and use them elsewhere; but that is not the test to be applied to this partnership agreement.   What was immediately necessary for the successful operation of the property?   That, must be constructed, even if it endured a century and in the distant future might largely benefit others.   Nearly all mine improvements, constructed by those who first open the mines but do not exhaust them, are more or less beneficial to their successors; those who made them do not destroy them when their term ends; therefore, in this sense, they are permanent.   But they were constructed solely for the benefit of those who made them, because, they to them, were necessary during their temporary occupation of the land, but no longer.   In this sense they were temporary, and it may be safely assumed, would not have been made if those who expended their money on them had not deemed them immediately necessary for their profit. The manifest weight of the evidence sustains all of the material averments of the defendants in their answer as to the immediate necessity for these improvements and other expenditures.   They are not bound to account further, because they have regularly and fully accounted and paid the net earnings to the partners. Any funds in their hands, for which they, according to their answer are held for distribution and for which they have not

yet accounted to the plaintiffs, should at once be paid over, accompanied by satisfactory accounts.

In effect, this reverses the decree of the court below. It is further ordered that the costs be paid by the appellees.

It is not improbable that Clora Markle has been misled to her hurt in this litigation. As is obvious, from her testimony, her knowledge of the business is very limited and her principal advisor is her brother, George; but, as long as that relation continues, she must abide the consequences which flow from his guidance. As to John and George, they are intolerant of each other. John is a competent mining engineer and business man. His testimony shows that he is not ignorant of his own merits. George has not been successful. His large estate,—at least, a great part of it,—has slipped away from him; he has become embittered against his associates, especially his brother John, and doubtless believes they have wronged him. His belief is founded on no facts warranting it. Perhaps if John, the manager, had shown toward him a little more gentleness, and had acted with a little more tact, all this prolonged and expensive litigation, which has now been before us in different shapes in not less than four appeals might have been avoided. George, perhaps, might have been convinced, as was his brother Alvan, that his copartners were in good faith managing this large and profitable property for the best interests of all. But it is useless to now speculate. It is possible the partnership may be harmoniously conducted in the future. If not, then at the end of six months from filing this decree, under the clause of the agreement providing for the sale of an interest of any one of the partners to the others, the court below may have to interfere, if they cannot agree. Therefore, while we reverse the decree of the court below, we will not finally dismiss the bill, but leave it pending, so that equity may be done in this particular without disturbing the ordinary business operations of the partnership.