McFadden, Appellant, *v.* Lineweaver & Co., Inc.

Argued May 22, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Allen S. Olmsted, 2nd,* with him *Francis J. Walsh* and *Saul, Ewing, Remick & Saul,* for appellant.

*Chester N. Farr, Jr.,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, July 1, 1929:

On August 10, 1917, Congress passed the Lever Act (c. 53, 40 Stat. 276), to regulate, as a war measure, the price which might be charged for food and fuel. In pursuance of the authority given by this statute several administrative orders were issued. One, dated August 21, 1917, fixed the price of Pennsylvania bituminous run-of-mine coal at $2 per net ton. Another, dated August 23, 1917, provided that "For the buying and selling of bituminous coal a jobber shall not add to his purchase price a gross margin in excess of 15 cents per ton of 2,000 pounds, nor shall the combined gross margins of any number of jobbers who buy and sell a given shipment or shipments of bituminous coal exceed 15 cents per ton of 2,000 pounds." Plaintiff and defendant are both jobbers; the former bought Pennsylvania bituminous run-

of-mine coal at $2.00 per net ton and sold it to defendant at that price plus his, plaintiff's, share of the jobbers profit, and defendant sold it to his customers at the $2.15 per net ton. By another administrative order, dated September 6, 1917, it was stated that "the prices fixed [in prior orders] are provisional, [but] will stand unless changed by order of the President for good cause shown. The fuel administrator will examine all applications for revision of prices accompanied by cost statements presented in writing....... It is not proposed to require efficiently operated mines to produce coal at a loss, but the burden rests upon applicants to show that the prices fixed in particular cases are unfair....... It is suggested that sales and deliveries be made at the prices fixed, with a stipulation to the effect that if prices are readjusted settlements should be made accordingly." Nothing was said about reopening settlements which had been concluded, and the language used could, of course, only refer to instances where they had not been, for settlements could not be made according to prices which did not exist when they were made. Moreover, any other interpretation would necessitate the conclusion that, if the government's maximum price should be raised or lowered at any time in the future, no matter how distant, all prior settlements could be reopened, and additional payments or refundings required, perhaps at a great and irreparable loss to one of the parties.

From September 7, 1917, to October 30, 1917, defendant gave to plaintiff fourteen orders to ship coal to defendant's customers, at the price specified in the above administrative orders; plaintiff accepted them and made the shipments as directed, and defendant paid for the coal at that price. Each of these orders, which, for present purposes, we shall treat as unlimited in point of time, stated, in effect, that the order was "subject to any upward revision in price by the U. S. Government." Construed in connection with the administrative order of September 6, 1917, above quoted, which suggested

this character of contract, the "upward revision" referred to could relate only to such as were not settled for when the advance in price, if any, was made.

On February 12, 1918, a new administrative order was issued. It was addressed to "all persons, firms and corporations engaged in the mining and production of coal in the State of Pennsylvania" (a class to which neither plaintiff nor defendant belonged), which, after reciting that the government had, upon application, advanced prices at particular mines, declared that "coal mined in operations......[in certain counties, which included those where the prices had been specially advanced, and where plaintiff bought the coal he shipped to defendant's customers] may be sold, pending further investigation, at a price not exceeding $2.60 per ton for each of the grades of coal known as run-of-mine....... This order annuls and supersedes all previous orders...... relating to the price of coal produced in the territory above described, and shall become effective at 7 A. M., February 16, 1918." Plaintiff claimed that this order was applicable to the foregoing "subject to any upward revision" clause of his contracts with defendant, and hence brought the present suit to recover sixty cents per ton on the coal which defendant had paid for long before the date of the order. That the government did not intend to give it this effect is evident, for if it is to apply to all contracts made, concluded and paid for since the Lever Act was passed—the necessary effect of plaintiff's contention,—then the provision that the order, though dated February 12, 1918, "shall become effective at 7 A. M., February 16, 1918," is wholly meaningless, a conclusion not permissible unless no other is reasonably possible: Knickerbocker Trust Co., v. Ryan, 227 Pa. 245; Orth & Bro., v. Board of Education, 272 Pa. 411.

Moreover, these administrative orders were specially authorized by and had all the force and effect of statutes, and hence should be construed according to the same rules as the latter, one of which is that they will not be

given a retroactive effect (particularly where, as here, to so interpret them would add materially to the burdens of one of the parties) "unless the language is so clear as to preclude all question as to the intention of the legislature": Sproul v. Standard Plate Glass Co., 201 Pa. 103; Merrick v. DuPont et al., 285 Pa. 368. Here the language expresses no such intention. On the contrary, it is plainly dealing with subsequent sales only, for it refers to coal that "may be sold," a clause which necessarily relates to the future.

We are also of opinion, in view of the fact that the administrative order relied on was addressed to the "persons, firms and corporations engaged in the mining and production of coal" (which plaintiff and defendant were not), that it was not intended to alter the limitation of fifteen cents per ton profit to which they, being jobbers, were restricted by the prior order of August 23, 1917. The legal reason underlying this conclusion is that the order must be construed with reference to its subject-matter and obvious purpose, and its scope and effect limited accordingly: Camden Safe Deposit & Trust Co. v. Eavenson, 295 Pa. 357. The same principle applies when we consider the body of the order, which shows, by its recitals, that its purpose was to fulfil the implied promise of the Government to mine operators, inherent in the statement that it was not intended "to require efficiently operated mines to produce coal at a loss." Hence, the fulfilment of this promise must be held to inure to their benefit solely, and not to give plaintiff, a jobber only, an additional profit.

What has been said disposes of all the points made in or suggested by the statement of questions involved, and beyond that we need not go: Com. ex rel. v. Kline, 294 Pa. 562; Whalen v. Smith Fireproof Construction Co., 296 Pa. 10.

The judgment of the court below is affirmed.