## HUGHES et al. v. E. I. DU PONT DE NEMOURS & CO.

District Court, E. D. Pennsylvania. February 7, 1930.

No. 12102.

Owen J. Roberts, of Philadelphia, Pa., for plaintiffs.

Abel Klaw and Thomas Stokes (of Pepper, Bodine, Stokes & Schoch), both of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This is the case of a directed verdict. The facts are not in dispute. The analogue is in consequence that of a special verdict of the jury finding the facts and asking the trial court to mold the verdict for the plaintiff or for the defendant as the law arising out of the facts as found dictates. The court accordingly directed a verdict for the plaintiff. The question thus becomes one of law as if upon a case stated.

An outline fact statement may be made within small compass. The plaintiff is a coal miner. His mine supplies a coal of such fuel qualities as to be characterized as smithing coal. This name we assume was given it because it answered to the requirements of the forge of the Village Blacksmith. The name is sufficiently expressive. Such coal could, of course, be used as a fuel for any steam producing purpose, but was of a higher grade

and quality than required for such purposes and such as fitted it for the requirements of blacksmithing use. Because of this capability of a more exacting use, it commercially commanded a higher price, which any purchaser who needed it for the higher use would willingly pay. The buyer who wanted coal for ordinary steam making purposes would, of course, content himself with the lower priced coal and would not buy smithing coal if he could get the other at a lower price, notwithstanding the truth that the smithing coal would more than meet all his requirements. Smithing coal is bituminous, and by a wartime executive order under date of August 21, 1917, the prices "of bituminous coal at the mine" were fixed, and on October 9, 1917, an order issued that "smithing coal *when used for smithing purposes only*" might be sold at the market price. We have italicized the words pertinent to the instant case. There were modifications of the orders, but none which we can see touch the merits of the present controversy beyond a perhaps overlapping of three days in the date of a later order and the time covered by the shipments in question. This overlapping we have ignored and treat the questions raised as those to be answered in the light of the order quoted. The defendant company had imperative use for fuel coal, but no need for smithing coal as such. The order went out that the plaintiff ship the entire output of its mine to the defendant, and this order was obeyed. The coal shipped was in fact "smithing coal" when viewed from the standpoint of its quality as it came from the mine, but in the trade sense of that term only 63.6 per cent. was smithing coal, because in preparing smithing coal for the market for smithing purposes, and the limited market demand for the latter resulted in 36.4 per cent. of the mine output being rejected as smithing coal and reduced to the standard of ordinary fuel coal. Generically all the coal shipped to the defendant was bituminous coal, as smithing coal itself is. The defendant company having, as already stated, need only for fuel coal, used the coal shipped to them for fuel purposes and did not use any of it, in the language of the regulations, "for smithing purposes only" or for smithing purposes at all. The plaintiff invoiced the coal 63.6 per cent. of it at the smithing coal price and 36.4 per cent. of it at the bituminous coal price. The defendant insisted upon its right to take the whole shipment at the latter price. The dispute was for the time being adjusted by the defendant paying the bituminous coal price, without prejudice to the right of the plaintiff in accepting the less price to recover for the greater, and this action was brought to have the question raised between them ruled. The parties presented their respective contentions in points of requested charge, each asking for binding instructions. The trial judge affirmed plaintiff's point and negatived that of the defendant.

[2] We begin the discussion with the proposition that the coal price-fixing regulations are the equivalent of statutory enactments. McFadden v. Lineweaver, 297 Pa. 278, 146 A. 901.

The administrative order of October 6th superseded all previous orders. We mention this because there is a difference between the order of October 6th and previous orders, at least in phraseology. The previous order limited the market value price to "coal specially prepared for use in smithing and sold for that purpose and for no other"; the last order allows the market value price for "smithing coal when used for smithing purposes only." This difference may be more than verbal, because this coal was "smithing coal," but had not been "specially prepared for use in smithing," nor had it "been sold for that purpose."

The question thus turns, as we view it, upon the meaning of the phrase "smithing coal when used for smithing purposes only." It may be remarked that the phrase is not employed with verbal accuracy because it refers to coal at the place and time of shipment when and where it has not been "used" at all either "for smithing purposes only" or for any purpose. The defendant interprets the use as the use to which devoted by the buyer; the plaintiff interprets the phrase as merely descriptive of the coal, its qualities, and consequent commercial value. The product of some mines is a coal which, while it does not reach the dignity of smithing coal, is none the less coal of such a high quality that it is sometimes sold as smithing coal for smithing purposes and is so used, although it is commonly sold for ordinary fuel purposes. Such coal might be called smithing coal and averred to be such. This suggests the employment of the phrase in the regulation. It must be smithing coal and not so-called smithing coal; it must be the kind of coal which when sold at free sales is bought and used for smithing purposes, and is the kind of coal which is sold only to those who buy and use it for smithing purposes and smithing purposes only. In other words, it must be real, genuine smithing coal, which commands the higher price of such coal and sells for more than coal bought for the ordinary steam making fuel purposes.

■ We have the same thought conveyed in reverse in the custom law provisions. High priced rugs may be imported at one rate; dunnage cloths at a lower rate or free. Rugs might, however, be used for dunnage and claim to come in at the lower rate or free. A law might in consequence be enacted that "dunnage cloths when used for dunnage purposes only" should be admitted at a low rate or free. This would not mean that high priced rugs, although called dunnage and temporarily so used, would be admitted under the dunnage schedule. The meaning of the regulation then is that the mine may sell at the market price any coal which is real smithing coal and which, if the government had not intervened, would have been sold for this purpose and this purpose only, and thus really commanded the higher price of genuine smithing coal. If it does not mean this, then it means that the buyer fixes the price not by the value of what he gets but by the use to which he devotes it, no matter to what higher priced use it may be adapted. In other words, if a price was fixed on wood fuel with a provision such as the one before us, that the market price should be charged for lumber taken when used for building or manufacturing purposes, then the government divertee who took curly walnut or mahogany lumber would get it at the price fixed for wood fuel, provided he did not use it for making furniture but used it only as fuel and for fuel purposes.

The very capable counsel for the defendant does not run away from this conclusion, but accepts it as the logical consequence of his reading of the regulation. He accepts it without demur because ita lex scripta est. Such a reading, even if such was its letter, would mean, as is the case here, that when the government had fixed a price on one thing and a price of several times as much on another thing, a governmental divertee could take the high priced thing at the price of the low priced one by the simple expedient of devoting the high priced thing to the low priced use. This surely would not be far removed from taking private property for public use at a fraction of just compensation.

■ We need not, however, make any other use of this truth than to invoke the proposition that when one reading of this regulation leads to what would commonly be thought to be an injustice which another reading avoids, the innocuous reading will be followed, if it can be done without violence to the sense expressed.

We are unable to see in the order of April 15, 1918, even if it applied to the transaction before us, the value to the defendant which counsel see in it. The order had a directly opposite motive and purpose to that of this action. This suit is brought to require the defendant to pay the regulation price of the smithing coal which it in effect commandeered; the order of April 15, 1918, was made to discourage evasions of the regulation price by paying a higher price for fuel coal than that fixed by law. As we see it, whatever argument can be extracted from this order cuts with the plaintiff. The order plainly implies that smithing coal commands a higher regulated price than fuel coal. The regulation fixing a low price for fuel coal might thus be evaded by invoicing fuel coal as smithing coal. As low priced fuel coal was not fitted for smithing uses, this use was required. Clearly this regulation has no application to the situation here. As long as human nature is what it is, no law will be required to compel a man to get $2 or more for $1 whenever he can. The regulation of 1918 thus recognizes that the then existing regulations fixed a higher price on smithing coal than on fuel coal and forbade the sale of one at the price fixed for the other.

The conclusion of the argument of the defendant is that the price of smithing coal is the same as fuel coal, if the buyer so elects.

The whole argument is compressed into a statement of the effects which the defendant's construction of the regulations have and that which the plaintiffs have and a choice between them.

The defendant's construction means:

1. That a governmental divertee having use for something, the regulation price of which has been fixed at $1, may commandeer at the $1 price something else, the price of which is, in like manner, fixed at $2, provided he uses the $2 thing for the $1 purpose.

2. When a thing has several uses, for the highest of which it commands a price which the government regulations recognize, the thing can be commandeered by a government divertee at half that price, provided it is used for a lower priced purpose, so that the same thing commands two government regulated prices dependent upon the use the buyer makes of it.

The plaintiff's construction means:

3. When a thing, because of some use of which it is capable and for which it is used, commands a price which the government regulations recognize and fix, it may be sold at that price, and if it is commandeered by a governmental divertee, he must pay that price notwithstanding a lower price is fixed for

728

something else which has a lower priced use to which the divertee devotes the higher priced thing.

As the regulations can without violence to the language in which couched be given the latter construction, we adopt this.

This makes it unnecessary to go into the propositions of constitutional law by which counsel for plaintiff further fortifies the verdict rendered.

Analogues are helpful to some minds, but to others they are diverting and in consequence confusing. We will, however, venture upon one. A builder of railroad cars sells cars which are used for freight service and for passenger service. The passenger cars commanded a higher price than the freight. A regulation was adopted fixing a price for cars but permitting a higher price for "passenger cars used for passenger car service only." A buyer who has use for freight cars only commandeers a passenger car but uses it only for freight car purposes. Should he pay only the lower price freight car price or the higher passenger car price? Our ruling is he should pay the higher price.

In the supplemental brief submitted by the defendant, some points are made which we see no need to discuss. We see no inconsistency in the act of the plaintiff in charging for the smithing coal taken by the defendant at smithing coal prices and the fuel coal at fuel coal prices. We further see, in the view we have taken of the cause, no variance in the trial proofs from the pleadings, inasmuch as we have ruled the question in accordance with the views of defendant's counsel, that the cause should be determined in accordance with the meaning of the cited order as expressed. We simply differ with him upon the meaning of that order. We in consequence saw no reason to go into a discussion of the constitutional questions raised, and counsel for defendant has simply given us an additional reason for refraining. We likewise see no reason to vindicate the reasonableness or fairness of the prices fixed by the order in question, because we repeat that the trial ruling made was a ruling based upon the meaning of these orders and of the prices fixed thereby, and not in criticism of them. So far as the constitutional questions discussed in the brief, and to which counsel returns in the closing section of the supplemental brief, we are willing to accept arguendo and for the purposes of this case that there is no Constitution in war times.

The rule for a new trial is discharged, and plaintiff has leave to enter judgment on the verdict, with interest and costs.