## Nick et al. *v.* Craig et al., Appellants.

Argued May 13, 1930. Before MOSCHZISKER, C. J.,
FRAZER, WALLING, SIMPSON, KEPHART, SADLER and
SCHAFFER, JJ.

52

*W. Pitt Gifford,* of *Gunnison, Fish, Gifford & Chapin,* for appellants.—The members of the Glenwood Syndicate organized for the purpose of developing and selling certain parcels of real estate, title to which was placed in a trustee and their interests represented by negotiable certificates, were not tenants in common to the title of said property: Thomson's Est., 153 Pa. 332; Oliver's Est., 136 Pa. 43; Pittsburgh Wagon Works Est., 204 Pa. 432; Cronkhite v. Trexler, 187 Pa. 100; Abbott's App., 50 Pa. 234; Hambleton v. Rhind, 84 Md. 456; Markle v. Wilbur, 200 Pa. 457; Peacock v. Cummings, 46 Pa. 434.

The members of the Glenwood Syndicate were estopped from denying their liability to participate in expenditures outside of the contract, incurred in developing and selling the property, necessary to the success of the project, and resulting in large profits to the members: Kirk v. Hamilton, 102 U. S. 68; Hill v. Epley, 31 Pa. 331; Bidwell v. Pittsburgh, 85 Pa. 412.

The plaintiffs were bound to participate in the special expense item of $13,704.10 allowed to the selling company: Linebach v. Wolle, 211 Pa. 629; Peter's Est., 20 Pa. Superior Ct. 223.

*Charles H. English,* of *English, Quinn, Leemhuis & Tayntor,* for appellees.—The legal import of the arrangement is that appellees and their associates were tenants in common of the land, and not partners: Bell v. Johnston, 281 Pa. 57; DeHaven's Est., 248 Pa. 271; Butler

S. Bank v. Osborne, 159 Pa. 10; Hopkins v. Forsyth, 14 Pa. 34.

The interest of one tenant in common cannot be affected by the decisions or contract of cotenants not previously authorized or subsequently ratified by him: Mercur v. R. R., 171 Pa. 12; Caveny v. Curtis, 257 Pa. 575.

Conceding that appellees and their associates were partners, a majority of the partners could not change or modify the fundamental articles of partnership: Yeager v. Wallace, 57 Pa. 365; Markle v. Wilbur, 200 Pa. 457.

Assuming that the resolution of June 12, 1918, was legally adopted and binding on appellees and their associates, it necessarily must be restricted to the business of the syndicate within the terms of the agreement of February 4, 1918: Harrity v. Title & Trust Co., 280 Pa. 237.

OPINION BY MR. JUSTICE SIMPSON, June 21, 1930:

Six of a syndicate of twenty persons, who were the equitable owners of a tract of land, each of the twenty having the same financial interest therein, filed a bill in equity for an account, against the substituted trustee, who held the legal title for the syndicate, and a land company, which had agreed to develop and sell the land for the benefit of the syndicate; the other equitable owners being made defendants, in order that all possible interests might be parties to the suit. The decree, as originally entered, awarded certain sums to each of the plaintiffs, but, through an oversight, failed to allow them interest on the money of which they had been deprived. On appeal therefrom, we remitted the record, with a direction to determine this question also: Nick v. Craig, 298 Pa. 411. The final decree, subsequently entered, allowed the interest, and directed the land company to pay to the trustee, for the benefit of each plaintiff, a specified sum, which the trustee, in turn, was directed to

pay to those thus found entitled. From that decree, the trustee and the land company have each prosecuted one of the present appeals. That taken by the trustee could probably be quashed, since he is not harmed by the decree, his sole duty under it being to distribute to the several plaintiffs the sums which the land company pays to him for their benefit. Inasmuch, however, as we intend to charge both appellants with the costs in the court below (that matter having been overlooked when the final decree was entered), we will treat the case as if no objection could properly be made to the appeal by the trustee.

The agreement, which is the basis of the action, is signed by all the members of the syndicate, as parties of the first part, by the trustee, who originally held the legal title to the land for the benefit of the syndicate, as party of the second part, and by the land company, as party of the third part. At that time the land company had an undisclosed option to purchase the property for $70,000. The agreement recites the then existing titles to the land, that the syndicate desired to purchase it from the land company for $100,000, payable as therein stated, and that "for the purpose of subdividing and selling the same in lots or parcels, and to facilitate sales and deeds which may from time to time be made, [the tract] shall be forthwith conveyed by good and sufficient deeds of general warranty to the [trustee], in trust......for the benefit of [the syndicate], subject to a right of sale" by the land company; that the $100,000 to be paid by the syndicate "is to cover all taxes and interest to January 1, 1919, and that said premises are to be conveyed to [the trustee] free and clear from all encumbrances......[that the land company] hereby agrees to contract for and pay all expenses incurred in the development and selling the lands above described, including plotting and marking of lots, preliminary rough grading of all streets, printing, advertising, office expenses, clerk, office and hiring of salesmen, and in-

cluding all other services and expenses performed by or incurred by [the land company], unless special expenses are incurred by express agreement with [the syndicate] in which event such expenses shall be paid as then agreed upon...... All moneys derived from the sale of said lots shall be paid to [the trustee] and shall be by him divided or applied as follows: ....... [to the land company] 33⅓ per cent...... of all moneys derived from the sale of lots during the preceding month. It being understood and agreed that said commission or compensation is to be in full of all services rendered or expenses incurred by it, and that it will furnish at its expense all necessary letter heads, pass books, contract blanks, deed-forms and papers required to carry out their agreement in connection with the sale of lots, and shall also secure abstracts of title......and have the title insured." It further specifies that the other 66⅔ per cent is to be used in paying interest on a purchase-money mortgage provided for, and on account of its principal, when directed by the syndicate, the taxes, and such bills as the syndicate may direct, and that the balance "shall be divided among [the members of the syndicate] according to their respective interests in this contract......the interest of each...... [member to] be and is hereby declared to be in the proportion that the amount subscribed for and actually paid in......bears to the total amount of the consideration, to wit, the sum of $100,000...... It is also agreed and understood that this contract shall terminate June 15, 1924, at which time all unsold lots shall be conveyed, all contracts for sale of lots be assigned or transferred, and all moneys belonging to [the syndicate] shall be paid or turned over by [the trustee to the syndicate] or to such person or company as they may direct, and [the land company's] interest in all lots unsold at that time [shall cease]...... For the faithful performance of this agreement the parties hereto bind themselves, their heirs, successors, administrators and assigns by these presents."

There is neither averment nor proof that anything was omitted from or added to the agreement by fraud, accident or mistake; hence, it must be construed exactly as it is written, and all prior negotiations as to its terms must be considered as merged in it. In construing it, however, appellants ask us to decide that the clause which says the land company "hereby agrees to contract for and pay all expenses incurred in the development and selling the lands above described, including plotting and marking of lots," etc., etc., excludes everything preceding the word "including," unless it is embraced within the language which follows. This we cannot do, for not only would it make "including" to operate as "excluding," despite the plain language to the contrary, but it would also result in making the preceding words absolutely useless, which is not permissible, unless no other course is reasonably possible: Orth & Bro. v. Board of Education, 272 Pa. 411; McFadden v. Lineweaver & Co., 297 Pa. 278. We need not stress this point, however, since, among the things in the same sentence and following the word "including," is the clause "and including all other services and expenses performed by or incurred by" the land company. So, also, immediately following the provision that the land company shall get ⅓ of the "moneys derived from the sale of lots," there appears the further clause: "It being understood and agreed that said commission or compensation is to be in full of all services rendered or expenses incurred by" the land company. It follows, that, under the agreement, the land company could not have any claim against the syndicate for "services rendered or expenses incurred," "unless special expenses are incurred by express agreement with [the syndicate] in which event such expenses shall be paid as *then* agreed upon." That is, the fact that they are special expenses and how they are to be paid, must both be agreed upon before the services are rendered, and if this is not done no right to repayment can arise, by virtue of the agreement, even

though appellants' other contention, hereinafter fully considered, is sustained, viz., that all the members of the syndicate are bound by the actions of a majority thereof.

In an elaborate opinion the court below held that the syndicate members were tenants in common of the property, and hence none of the appellees was bound by anything which was done in regard to it, unless he consented thereto, or by his conduct was estopped to dispute his liability. Appellees still so maintain. Appellants, on the other hand, allege that the syndicate members were but partners, and that all were bound by the acts of the majority. Interesting as this dispute is, we do not find it necessary to decide the point. If we were to accept appellants' view that the members were partners, it would not follow that all were bound by the acts of the majority. This would be true, of course, as to persons dealing with the partnership in ignorance of the true relation between its members; but the trustee and the land company, who are the only appellants, are not in that class. Each of them signed the agreement and each knew its terms; hence, unless an estoppel is shown, appellees cannot be held for any acts of the majority, in antagonism to the terms of the agreement. Section 9, paragraph 4 of the Uniform Partnership Act of March 26, 1915, P. L. 18, 20, expressly provides that "No act of a partner in contravention of a restriction on his authority shall bind the partnership to persons having knowledge of the restriction"; and clause (h) of section 18 of the same statute (P. L. 23) says "Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners; but no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners." This, indeed, has always been the law of Pennsylvania, as shown by the cases of Peacock v. Chambers, 46 Pa. 434; Clarke v. Slate Valley R. R. Co., 136 Pa. 408, 414, and Markle v. Wilbur (No.

1), 200 Pa. 457, 468, cited by appellants in their brief, in the first of which it is said, at page 436, that while, "in case of a partnership, the majority is to govern...... where there is no stipulation in the partnership articles to control or vary the result,......*if there be any stipulation, that ought to govern.*" The rights and liabilities of appellees, even though they be treated as partners, are, therefore, exactly the same as if they were tenants in common. This brings us to a consideration of the specific objections made to the rulings of the court below.

As to E. W. Nick and Charles J. Schlipf, two of the plaintiffs, the land company was held liable to each of them for his proportion of the sums of $47,107.70, $6,200 and $11,999.05 respectively, for which it claimed credit as expenses allowed to it by a majority of the syndicate. As to each of the other plaintiffs, the court below only allowed them their proportion of the $47,107.70, less $13,704.10, holding that, as to this latter sum, and also as to the items of $6,200 and $11,999.05, they had, by their conduct, estopped themselves from recovering against the land company.

As concerns the items aggregating the $47,107.70 and $11,999.05, the chancellor found as a fact that "no expenses at all were incurred that would not fall under the agreement 'to pay all expenses in developing and selling the lands.'" This finding was approved by the court in banc and is now approved by us. Indeed, appellants do not seem to assert anything to the contrary, their assignment of error, embodying that extract from the adjudication, evidently being intended to object to the legal conclusions set forth in the immediate context and included in the assignment. Their main contention grows out of the fact that the minutes show these plaintiffs were present at an early meeting of the syndicate when the following resolution was adopted: "On motion it was resolved that all actions and business coming before the meetings of the syndicate were to be decided by

a majority vote, provided a quorum were present, and that not less than eleven members representing a majority in interest would constitute a quorum." As to this, the chancellor and the court in banc held that it was "administrative and does not create authority to change the fundamentals" of the contract with the land company. All the probabilities are in favor of this conclusion: see Harrity v. Continental Equitable Title & Trust Co., 280 Pa. 237. The meeting referred to was not *with* the land company, but *of* the members of the syndicate. It is not pretended that the basic contract with the land company was a subject of consideration at that time. On the contrary, the same minutes show that "the meeting was called for the purpose of effecting an organization and adopting rules and election of officers to carry on the business of the syndicate." If appellants' contention is sound, then, under that resolution, a bare majority could have directed a conveyance of the realty to the land company, or have done anything else regarding it, to the prejudice of the syndicate members, despite the statutory inhibitions already quoted. What has been said applies with equal force to a resolution adopted at a later meeting of the syndicate "that an executive committee be elected with full authority to perform such acts and transact such business as may be necessary for the purposes of the syndicate." What that committee did, if anything, in antagonism to "the purposes of the syndicate," was outside of the scope of that resolution and had no binding effect on appellees.

Appellants also urge that plaintiffs are estopped because, without protest, they stood by and allowed the land company to make large expenditures in the development of the property. But that is exactly what the land company agreed to do, and was bound to continue doing, for the joint benefit of itself and the syndicate. This appellants knew. So far as any of the plaintiffs approved the bills of the land company growing out of the later alleged agreements with it, the court below

held them estopped; although no new consideration was shown to sustain these agreements. This was the utmost limit to which it should have gone.

As concerns the item of $6,200, it appears that one of the most valuable pieces of land was conveyed by the trustee, at the instance of the land company, to the president of the latter, for a grossly inadequate consideration. The court below so decided, and, upon sufficient evidence, determined what was the real value at the time of the conveyance, and credited Mr. Nick and Mr. Schlipf only, who were not estopped, with their proportion of the excess value. We see no error in this.

In the decree, Mr. Nick is given a double allowance, because he had bought out and taken an assignment of the share of one of the other members of the syndicate. Appellants contend that Mr. Nick should not have been allowed to recover on it, because, if the syndicate members were tenants in common, title to that share could have been passed by a formal deed only; and because, also, it does not appear that the vendor "was a protestant against the allowance of any of the special items of expenditure claimed by the land company and assented to by the majority of the syndicate." Neither of these objections can prevail. The answer expressly admits Mr. Nick's ownership of this share; and the burden was on appellants to show that the vendor was estopped, and hence that Mr. Nick's purchase was subject to the existing estoppel. This they did not do. It may be added, also, that, so far as the record discloses, there was no estoppel against the vendor of that share.

It was also strongly urged by appellants that two of the plaintiffs should have been excluded from recovering any portion of the purchase price realized from the sale of lots during specified months, because they had executed receipts stating that the amount then received was "in full settlement of distribution of receipts and expenditures" for that month. This is neither a wise nor a valid contention. By the agreement, the trustee

was to receive the purchase price of lots sold, and to distribute the fund, inter alia, to plaintiffs. Instead of doing this, he let the land company take the purchase price, keep it for a long time, and distribute it when and as they saw fit. On these distributions, he received from the land company checks for the individual shares of the members of the syndicate, with directions not to deliver them unless the payees would execute "a release of all money collected to that date." This he agreed to do and did insist on, though both knew it was his duty to unconditionally pay over at once at least the amounts specified in those checks. Hence, his demand that they execute the alleged releases, as a condition precedent to his paying those sums, was directly in the teeth of his duty under the agreement, and seems to show connivance with the land company to injure those for whom he was trustee. At first the plaintiffs refused to accede to these wrongful demands, but two of them, possibly under the stress of monetary needs, subsequently signed receipts of the character above quoted, at the time they received the amounts specified in the checks. Quite possibly, equity, under the facts above stated (which were testified to by the trustee himself and by the president of the land company), would hold that receipts thus obtained were of no validity except as proof of the payment of specified sums; but, in any event, under such circumstances, the utmost effect which would be given to them, in equity, would be to cast upon the signers the burden of showing that the amounts named in the receipts were not in fact a "full settlement" of the sums which the land company actually owed to them. This burden, if it existed, was successfully carried.

What we have said above, covers all that is necessary in disposing of the points raised by the assignments of error and suggested by the statement of the questions involved, and beyond this we need not go: Com., to use, v. Crow, 294 Pa. 286; Liacopolos v. Coumoulis, 298 Pa. 329.

62

The decree of the court below is affirmed and each appeal is dismissed; appellants to pay the costs in the court below, and each appellant to pay the costs on his appeal to and in this court.