## HIGHLAND *v.* RUSSELL CAR & SNOW PLOW COMPANY.

No. 8. Argued February 23, 24, 1929.—Decided April 8, 1929.

*Mr. Ira Jewell Williams,* with whom *Messrs. Ira Jewell Williams, Jr., Lisle D. McCall,* and *Francis Shunk Brown* were on the brief, for petitioner.

*Mr. A. M. Liveright* for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Petitioner sued respondent in the court of common pleas of Clearfield county, Pennsylvania, to recover a balance of $830.80 alleged to be due on account of coal sold between October 17, 1917, and February 15, 1918.

The complaint shows the following facts. October 2, 1917, plaintiff wrote defendant that he had purchased the output of certain mines and offered coal at $3.60 per ton. Defendant answered that it wanted a carload per week until further notice. Plaintiff replied that he had entered defendant's order for that amount. November 14, after plaintiff had shipped some of the coal, he wrote defendant that, owing to a recent wage agreement made between the miners and operators, the cost of mining had been increased 45 cents per ton; that plaintiff was obliged to pay the additional cost to the producer, and that he was making a price until further notice of $4.05 per ton. He added: "Unless I hear from you to the contrary I shall take it for granted that you wish me to continue shipments on your order at this new price." The amount sued for was based on $3.60 per ton for coal shipped in October and $4.05 per ton for that delivered later. Defendant had paid $1,531.84.

The affidavit of defense admitted the sale and delivery of the coal, denied any agreement as to price; and, among

other averments not here material, alleged that the United States had fixed the prices of the coal and that its value on that basis was $1,322.74.

The trial court held that the plaintiff was bound by the prices fixed by the Government; and, notwithstanding a verdict for the plaintiff, gave defendant judgment, which was affirmed by the superior court and also in the supreme court of the State.

The prices so held applicable were fixed by the President pursuant to § 25 of the Lever Act approved August 10, 1917, c. 53, 40 Stat. 276, 284. An executive order of August 21 specified $2.00 per ton on board cars at the mine; and an order made October 27 added 45 cents per ton.

Plaintiff here insists, as he maintained in the state courts, that Congress had no power to establish or to authorize the President to prescribe prices for coal without providing just compensation for those who, in the absence of such regulation, might have sold their coal for more. And he contends that, in violation of the due process clause of the Fifth Amendment, the Act and orders operate to deprive him of liberty of contract. His coal was not requisitioned for public use. He does not claim that the amount paid by defendant was not compensatory or that it did not give him a reasonable profit or that the value of the coal was greater than the prices fixed by the President. The sole question is whether plaintiff's constitutional rights were infringed by the enforcement of the Act and orders to prevent him from selling his coal for prices in excess of the just compensation he would have been entitled to receive if it had been taken under the sovereign power of eminent domain.

Long before this country became involved in the war, Congress adopted measures for the national defense, and promptly after it entered the conflict there were developed

comprehensive plans for immediate and effective use of military force. An Act of June 3, 1916, 39 Stat. 166, authorized the enlargement, equipment and training of the army. An Act of August 29 following, 39 Stat. 619, 645, empowered the President in time of war to take and utilize systems of transportation for the movement of troops, war material and other purposes; and, December 26, 1917, the President did take over the railroads of the country. 40 Stat. 1733. The Joint Resolution of April 6, 1917, 40 Stat. 1, declaring war with Germany directed the President to employ the entire naval and military forces and pledged all the resources of the country to bring the conflict to a successful termination. An act of June 15, 1917, 40 Stat. 182, authorized the President extensively to exert the power of eminent domain in aid of construction and acquisition of ships.

The Lever Act was broader than its predecessors. It was passed to encourage production, conserve supply and control distribution of foods, fuel and many other things deemed necessary to carry on the war. Hoarding, waste, and manipulations for the enhancement of prices were condemned. The President was empowered to license and regulate production, prices and sales; to requisition coal and other necessaries, to purchase and sell wheat, flour and other staple articles of food, and to take over and operate factories and mines. Section 25 empowered the President to fix the price of coal, to regulate distribution among dealers and consumers, domestic or foreign, and to require producers to sell only to the United States through a designated agency empowered to regulate resale prices. The basis prescribed for the determination of prices to be charged by producers of coal was the cost of production, including the expense of operation, maintenance, depreciation and depletion plus a just and reasonable profit. And prices to be charged by dealers were

to be made by adding to their cost a just and reasonable sum for profit. The Act did not require producers or dealers to sell their coal. It provided for the ascertainment and contemplated the payment of just compensation for all property that it authorized the President to take.

During 1916 and the early months of 1917, the mining and distribution of coal had been greatly disturbed by conditions resulting from the war abroad and the preparations for national defense being made in this country. There was panic among consumers; and, in order to secure adequate supply, they offered prices higher than any theretofore prevailing. The prices of coal for immediate delivery, which previously had been from $1.50 to $2.00, were bid up to $5.00, $6.00, and in exceptional cases as high as $7.50 per ton. In April contracts for the year's delivery could be made only at prices ranging from $3.00 up to $5.00 or $6.00 per ton. In May of that year the Council of National Defense created a committee to deal with the situation. After prolonged negotiation with producers throughout the country an agreement was reached by which a tentative maximum price was fixed at $3.00 per ton at the mines, to which was added twenty-five cents for selling commission to wholesalers. The purpose was to fix a price high enough to stimulate production so that by the operation of the law of supply and demand fair and just prices would result. Final Report of United States Fuel Administrator, p. 20. Report of Engineers Committee 1918–1919, p. 1.

But this arrangement having failed to give assurance of an adequate supply, Congress and the President found it necessary to take the steps here involved. Defendant was engaged in manufacturing snowplows for railroads. Unquestionably, the production of such equipment was in the state of war then prevailing a public use for which coal and other private property might have been taken by exertion of the power of eminent domain. When regard

is had to the condition of the coal industry, plaintiff's control of the product of the mines referred to in his letters and the tone of his price quotations support the view that, in the interest of national safety, there was need of regulation in order to prevent manipulations to enhance prices by those having coal for sale and to lessen apprehension on the part of consumers in respect of their supply and the prices liable to be exacted.

It is everywhere recognized that the freedom of the people to enter into and carry out contracts in respect of their property and private affairs is a matter of great public concern and that such liberty may not lightly be impaired. *Steele* v. *Drummond,* 275 U. S. 199, 205. Generally speaking, that right is protected by the due process clauses of the Fifth and Fourteenth Amendments. *Allgeyer* v. *Louisiana,* 165 U. S. 578, 591. *Adair* v. *United States,* 208 U. S. 161, 174. *Coppage* v. *Kansas,* 236 U. S. 1, 14. *Adkins* v. *Childrens Hospital,* 261 U. S. 525, 546. It is also well-established by the decisions of this court that such liberty is not absolute or universal and that Congress may regulate the making and performance of such contracts whenever reasonably necessary to effect any of the great purposes for which the national government was created. *Frisbie* v. *United States,* 157 U. S. 160, 165. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 228 et seq. *Ellis* v. *United States,* 206 U. S. 246. *Atlantic Coast Line* v. *Riverside Mills,* 219 U. S. 186, 202. *Louisville & Nashville R. R.* v. *Mottley,* 219 U. S. 467, 482. *Baltimore & Ohio* v. *Interstate Commerce Commission,* 221 U. S. 612, 618. *Second Employers Liability Cases,* 223 U. S. 1, 52. *Gt. Northern Ry.* v. *Sutherland,* 273 U. S. 182, 193.

Under the Constitution and subject to the safeguards there set for the protection of life, liberty and property (*Ex parte Milligan,* 4 Wall. 2, 121. *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 151. *United States*

v. *Cohen Grocery Co.,* 255 U. S. 81, 88), the Congress and the President exert the war power of the nation, and they have wide discretion as to the means to be employed successfully to carry on. *Miller* v. *Robertson,* 266 U. S. 243, 248. *United States* v. *Chemical Foundation,* 272 U. S. 1, 10. The measures here challenged are supported by a strong presumption of validity, and they may not be set aside unless clearly shown to be arbitrary and repugnant to the Constitution. *Adkins* v. *Childrens Hospital, supra,* 544. The principal purpose of the Lever Act was to enable the President to provide food, fuel and other things necessary to prosecute the war without exposing the government to unreasonable exactions. The authorization of the President to prescribe prices and also to requisition mines and their output made it manifest that, if adequate supplies of coal at just prices could not be obtained by negotiation and price regulation, expropriation would follow. Plaintiff was free to keep his coal, but it would have been liable to seizure by the government. The fixing of just prices was calculated to serve the convenience of producers and dealers as well as of consumers of coal needed to carry on the war. As it does not appear that plaintiff would have been entitled to more if his coal had been requisitioned, the Act and orders will be deemed to have deprived him only of the right or opportunity by negotiation to obtain more than his coal was worth. Such an exaction would have increased the cost of the snow-plows and other railroad equipment being manufactured by the defendant and therefore would have been directly opposed to the interest of the government. As applied to the coal in question, the statute and executive orders were not so clearly unreasonable and arbitrary as to require them to be held repugnant to the due process clause of the Fifth Amendment.

*Judgment Affirmed.*