## E. I. DU PONT DE NEMOURS & CO., Inc., v. HUGHES et al.

No. 4376.

Circuit Court of Appeals, Third Circuit.

June 8, 1931.

Geo. Wharton Pepper, and Thomas Stokes, both of Philadelphia, Pa., and C. M. Spargo, of Wilmington, Del., for appellant.

Ulric J. Mengert and Robert T. McCracken, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge.

The plaintiffs had judgment on a directed verdict. The defendant appealed.

The plaintiffs sued to recover a balance they claim to be due for coal which Charles A. Hughes, their decedent, delivered and E. I. duPont deNemours & Company accepted and used under a government order during the war. The action is laid in assumpsit. As there was, admittedly, no express contract between the parties, the action must be in indebitatus assumpsit. The question is, What promise as to the price to be paid did the law raise on the part of the vendee?

The Congress, recognizing the exigencies of war, passed the Lever Act (40 Stat. 276, approved August 10, 1917) which among other things authorized the President generally to regulate production, prices and sales and particularly to requisition coal, and to fix the price of coal and regulate its distribution among dealers and consumers in order to prosecute the war effectively and without subjecting the government to unreasonable exactions. Thus the President, acting through the agency of the United States Fuel Administrator, had power absolutely to fix the price of coal between sellers and buyers and regulate its distribution and use. His adminis-

trative orders were a valid exercise of the power of the government at war, Highland v. Russell Car & Snow Plow Co., 279 U. S. 253, 49 S. Ct. 314, 73 L. Ed. 688, and had all the force and effect of statutes, McFadden v. Lineweaver & Co., 297 Pa. 278, 146 A. 901. So this case starts with the certainty that what the Fuel Administrator did in the name of the President had the force of law and, so far as it went, bound both parties.

The duPont Company was under heavy contracts with the government for munitions. Late in 1917, the exigencies of war becoming more and more acute, the government, through the War Department, called upon it to increase production. It had, on hand and under contract, enough coal to run its plants in carrying out its contracts, but to increase production beyond contractual engagements it required additional coal for steam purposes. At that time it was impossible to obtain coal otherwise than through the Fuel Administrator. Therefore the duPont Company reported to the Fuel Administration at Washington the government's demand for increased production and its inability to respond for lack of steam coal with the result that the Fuel Administrator, on December 15, 1917, telegraphed Hughes, an owner and operator of a bituminous coal mine in Pennsylvania, as follows:

"You are hereby ordered and directed to ship entire output of your number two mine account DuPont Powder Company Wilmington Delaware this order to take preference over all obligations except your allotment account Army Transports. * * * Send shipping notices of all cars to this office also Wilmington Delaware."

The Fuel Administrator confirmed this telegraphic order by a letter of even date in which he advised Hughes that the action he had taken was made absolutely necessary on account of increased fuel requirements of the duPont Company; that the Commission on Car Service had been requested and had agreed to place cars at his mine to take care of its full production; that the tonnage was to be sent under shipping directions from the Fuel Administrator's office to the various duPont plants and that the order with one exception took preference over all other obligations including railroad fuel. This plainly was a war transaction arising from a war emergency.

When the Fuel Administrator thus established the relation between Hughes and the duPont Company of seller and buyer of coal, nothing was said by anyone about the price.

This, doubtless, was due to the recognition by everyone of the Fuel Administrator's power to fix or agree to the price of coal and to the fact that each party thought he had done so in a particular way.

Under the Fuel Administrator's order Hughes began shipping to the duPont Company on January 9, 1918 and continued beyond February 14, 1918. All the coal produced from the Hughes mine was bituminous coal of a quality which rendered it useful not only for steam purposes but for smithing purposes. The price fixed by the Fuel Administrator for bituminous coal for steam purposes between the above dates was $2.45 a ton and the price for smithing coal, when sold with the permission of the Fuel Administrator for smithing purposes, was fixed by the market at $4.44 a ton. Reckoned from past experience in marketing coal for smithing purposes and steam purposes from the same mine, Hughes invoiced 63.6% of deliveries to the duPont Company as smithing coal at $4.50 a ton and 36.4% as steam coal at $2.45 a ton. The duPont Company paid for all the coal as steam coal at the current price fixed for bituminous coal and refused to pay more. In this it was supported by the Fuel Administrator. Hughes accepted what the company paid and demanded a balance at the higher price for smithing coal, hence this suit.

■ This difference of views as to price arose from the Fuel Administrator's several orders in respect to smithing coal. These orders, manifestly, were based on a number of conflicting considerations arising out of the war, namely; a recognized adaptability of certain bituminous coal for both smithing and steam purposes and a recognized difference in its sale value when used for one purpose or the other; the government's exigent war requirements; the requirements of the smithing trade not directly involved in prosecuting the war; and the Fuel Administrator's own difficult task of serving the government at war with as little disturbance to peace time trades as possible. His orders were no doubt influenced by the further consideration that smithing coal, being as good for steam purposes as other bituminous coal, must be kept under his control in order to maintain in proper balance coal distribution to peace and war time industries. In this difficult situation the Fuel Administrator, feeling his way, issued from time to time in the name of the President orders in respect to smithing coal of which that of October 6, 1917, the one here pertinent, read as follows: "*Smithing and*

*Cannel Coal.*—Until further action of the Fuel Administrator, smithing coal, when used for smithing purposes only, may be sold at the market price prevailing at the time of sale." (This order was annulled on February 14, 1918, by another order of that date requiring that all smithing coal be sold at the going government price for prepared sizes of bituminous coal, which was raised to $3.05 a ton. Because of this last order the plaintiffs limit their demand for payment at the market price for smithing coal on deliveries to that date.)

The learned trial court, construing the order of October 6 and charging the jury for a directed verdict, stated that the seller was entitled to receive the market price for smithing coal, and if the coal he sold was smithing coal, useful for smithing purposes, but used by the buyer for steam purposes, it must, nevertheless, pay the smithing coal price, inferring that otherwise the steam coal price for smithing coal sold would be unjust compensation.

We are constrained to take another view of the order on which both parties, though interpreting it differently, stand.

The Fuel Administrator was dealing with a commodity that, admittedly, had different uses, and different values according to the uses to which it was put. He had power (which later he exercised) to withdraw the price preference which by two of his orders he had given smithing coal. Moreover he had power in the exigencies of war wholly to withdraw coal of this dual quality from the smithing trade and devote it entirely to war industries for steam purposes. And particularly it was within his power—and it was his duty—to see that industries not essential to the war, and even industries essential to the war, should not rush in and bid up and buy up smithing coal for steam purposes to the disturbance of prices and coal distribution in his difficult scheme of stimulating war industries and keeping peace industries alive. Therefore, by the order in question, he decided that smithing coal "when used for smithing purposes only" might be sold on the market at the market price. This limitation as to use was in effect a holding that when not used for smithing purposes coal of this twofold character must not be sold at the market price for smithing coal but at the price fixed for coal used for its other purpose, that of steaming. We think the Fuel Administrator plainly made use of coal the test of the price. And this was wholly consistent with his problem of distribution.

However this order be interpreted it would, if obeyed, inevitably work a hardship on someone; on the vendee if it had to pay the higher smithing price for coal used only for steam purposes and on the vendor if he had to sell smithing coal at the low price of coal for steam purposes. And it is just here the plaintiffs maintain that in the latter event the order as we construe it would be unconstitutional because violative of the Fifth Amendment.

To decide whether "private property (was here) taken for public use, without just compensation" we must determine whether the property was taken, consider the compensation offered and inquire into the vendor's right, had he felt aggrieved, to resist the order and protect himself.

It should be noted that this transaction of sale did not emanate from either party. Hughes did not approach the duPont Company and offer to sell it coal, nor did the duPont Company approach Hughes and offer to buy his coal. So far as the record shows neither ever heard of the other until they simultaneously received the Fuel Administrator's order directing one to sell and the other to buy. Nor did they, thereafter, have any dealings in the matter. Both acted under the order without question and at once.

The order when accepted and obeyed created a contract between the parties for the sale and purchase of coal. Though silent in its written terms as to price, the price had nevertheless been fixed by the Fuel Administrator and entered into the contract. Highland v. Russell Car Co., 279 U. S. 261, 49 S. Ct. 314, 73 L. Ed. 688. The vendor could not recover for a quantum meruit on an implied assumpsit, for, as the action of the Fuel Administrator in fixing the price had the force of law, the only promise as to price which the law would raise on the part of the vendee is a promise to pay the price which the law itself had determined. Even so, the price might be unjust; but the Congress, anticipating such a possibility, provided by section 25 of the Lever Act a method of fixing prices to avoid such an occurrence. (40 Stat. 276, 284). Whether the price of $2.45 a ton conformed to that provision for just compensation is not important in view of the fact that the government had not requisitioned the coal and had done nothing more than order Hughes to sell it to the duPont Company impliedly at the price fixed for steam coal. This order was not mandatory upon Hughes for the Lever Act did two distinct things; it provided, first, that the government might req-

uisition supplies, and, second, regulate contracts between parties for supplies. The first is a direct taking of private property for public use; the other is not a taking at all. The act did not require Hughes to sell his coal to the duPont Company on the Fuel Administrator's order, Highland v. Russell Car Co., 279 U. S. 253, 260, 49 S. Ct. 314, 73 L. Ed. 688, but it did provide that he could sell his coal only as the Fuel Administrator should order and only at the price he should fix. Here was a dilemma in which Hughes found himself had he thought the price unfair. But to meet such a situation and to avoid the constitutional objection of unjust compensation the Lever Act gave Hughes a way out. He could have ignored the order and refused to make delivery to the duPont Company. He was free to keep his coal. Had he done this, however, he would have made it liable to requisition or his mine to be taken over by the government. Highland v. Russell Car Co., 279 U. S. 253, 262, 49 S. Ct. 314, 73 L. Ed. 688. When requisitioned, he could, under section 10 of the act, have accepted seventy-five per cent. of the price determined and sued the United States for the balance of his claim. United States v. New River Collieries Co. (C. C. A.) 276 F. 690, affirmed 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014. Hughes did not avail himself of this remedy afforded by the act but, having entered into the contractual relation with the duPont Company indicated by the order and made deliveries under it, he must be regarded as having acquiesced in the order and agreed to all the terms of the resulting contract of sale including that of price which, on the uncontradicted proof of sale and use of the coal for steam purposes only, was the price fixed for coal of that quality.

The judgment of the District Court is reversed with direction that a new trial be awarded and that it be conducted conformably with this opinion.