[No. 26251. *En Banc.* August 20, 1936.]

HARRY PRATER et al., *Respondents,* v. THE DEPARTMENT OF PUBLIC SERVICE et al., *Appellants.*[1]

[1]Reported in 60 P. (2d) 238.

*The Attorney General, Don Cary Smith, Assistant, Frederick J. Lordan,* and *Will M. Derig,* for appellants.

*Nuzum & Nuzum, Paul F. Schiffner, Richard S. Munter,* and *H. E. T. Herman,* for respondents.

*Thomas Balmer, A. J. Clynch, A. N. Whitlock, O. G. Edwards, A. C. Spencer, L. R. Hamblen, C. A. Hart, Dean H. Eastman, L. B. daPonte, Robert S. Macfarlane, James P. Neal,* and *Charles H. Miller, amici curiae.*

BLAKE, J.—In 1935, the legislature passed an act dealing comprehensively with the problem of the transportation of property over the public highways of the state by motor vehicles. Laws of 1935, chapter 184, p. 883 (Rem. 1935 Sup., § 6382-1 [P. C. § 234-13½a] *et seq.*). Section 1, p. 883, of the act reads as follows:

"*The business of operating as a motor carrier of freight for hire along the highways of this state is declared to be a business affected with a public interest.* The rapid increase of motor carrier freight traffic and the fact that under the existing law many motor trucks are not effectively regulated have increased the dangers and hazards on public highways and make it imperative that regulation should be employed to the end that the highways may be rendered safe for the use of the general public; *that the shippers of the state may be provided with a stabilized service and rate structure;* that the use of the highways for the transportation of property may be regulated to the extent required by the convenience of the general public." (Italics ours.) (Rem. 1935 Sup., § 6382-1 [P. C. § 234-13½a].)

Section 2, p. 884, is devoted to definitions of terms used in the act. It defines:

"(e) The term 'common carrier' means any person who undertakes to transport property for the general public by motor vehicle for compensation, whether over regular or irregular routes, or regular or irregular schedules, including motor vehicle operations of carriers by rail or water and of express or forwarding companies."

"(f) The term 'contract carrier' means any person, not included under paragraph 'e' of this section, who under special and individual contracts or agreements transports property by motor vehicle for compensation."

"(g) The term 'special carrier' means any person engaged exclusively in the transportation of logs, piling, poles, pulpwood, coal, minerals, sand, gravel, rock and other building materials in vehicles especially constructed and equipped for handling such commodities and operating for compensation." (Rem. 1935 Sup., § 6382-2 [P. C. § 234-13½b].)

Section 3, p. 885 (Rem. 1935 Sup., § 6382-3 [P. C. § 234-13½c]), specifies certain vehicles and operations to which the act is not applicable.

Section 4, p. 886 (Rem. 1935 Sup., § 6382-4 [P. C. § 234-13½d]), provides that it shall be unlawful for any person to operate as a "motor carrier" except in accordance with the provisions of the act.

Section 5, p. 886 (Rem. 1935 Sup., § 6382-5 [P. C. § 234-13½e]), provides that no common, contract or special carrier shall operate without first obtaining a permit from the department of public service. The terms upon which permits may be granted are specified. Certificates of convenience and necessity are abolished.

Section 6, p. 887 (Rem. 1935 Sup., § 6382-6 [P. C. § 234-13½f]), provides for the application for permits.

Section 7, p. 888 (Rem. 1935 Sup., § 6382-7 [P. C.

§ 234-13½g]), prescribes the fees to be paid for permits.

Section 8, p. 888 (Rem. 1935 Sup., § 6382-8 [P. C. § 234-13½h]), provides for the form of permits and the scope of operation to which the holder is entitled thereunder.

Section 9, p. 888 (Rem. 1935 Sup., § 6382-9 [P. C. § 234-13½i]), is not pertinent to our problem in this case.

Section 10, p. 888 (Rem. 1935 Sup., § 6382-10 [P. C. § 234-13½j]), authorizes the department of public service to establish reasonable classifications of the groups of carriers included in the terms common, contract and special carriers.

Section 11, p. 889, provides:

"The department is hereby vested with power and authority, and it is hereby made its duty, to supervise and regulate every 'common carrier' in this state; *to fix, alter and amend just, fair, reasonable and sufficient rates, charges, classifications, rules and regulations of each such carrier;* to regulate the accounts, service and safety of operations thereof; to require the filing of annual and other reports and of other data thereby; and to supervise and regulate such 'common carriers' in all other matters affecting their relationship with both the shipping and the general public." (Italics ours.) (Rem. 1935 Sup., § 6382-11 [P. C. § 234-13½k].)

Section 12, p. 889, provides:

"The department is hereby vested with power and authority, and it is hereby made its duty, to supervise. and regulate every 'contract carrier' and 'special carrier' in this state; *to fix, alter and amend just, fair and reasonable classifications, rules and regulations and minimum rates and charges of each such 'contract carrier' and 'special carrier';* to regulate the accounts, service and safety of operations thereof; and require the filing of annual and other reports and of other data thereby; and to supervise and regulate such 'con-

tract carriers' and 'special carriers' in all other matters affecting their relationship with both the shipping and the general public.'' (Italics ours.) (Rem. 1935 Sup., § 6382-12 [P. C. § 234-13½1].)

Sections 13 to 18, pp. 889 to 891, inclusive, are not pertinent to the problem presented in this case.

The pertinent portions of § 19, p. 892, are as follows:

''No 'common carrier' or 'contract carrier' shall collect or receive a greater, less or different remuneration for the transportation of property or for any service in connection therewith than the rates and charges which shall have been legally established and filed with the department, or as are specified in the contract or contracts filed, as the case may be, nor shall any such carrier refund or remit in any manner or by any device any portion of the rates and charges required to be collected by each tariff or contract or filing with the department. . . .

''The department may refuse to accept any time schedule or tariff or contract that will, in the opinion of the department, limit the service of a carrier to profitable trips only or to the carrying of high class commodities in competition with other carriers who give a complete service and thus afford one carrier an unfair advantage over a competitor.'' (Rem. 1935 Sup., § 6382-19 [P. C. § 234-13½t].)

A resume of the balance of the act (§§ 20 to 48, pp. 893 to 905, inclusive) is not necessary to the disposition of the issues raised in this case.

Pursuant to the authority vested in it under the act, the department of public service promulgated its order M. V. No. 22787, whereby it established rates to be charged for the transportation of certain commodities between various termini within the state. The order contains the following finding:

''Based upon the record in these proceedings and our varied experience in discharging the regulatory duties imposed upon the department by the motor freight transportation laws of 1921 and 1933 and after

considering all relevant matters properly before us we find that the minimum rates for contract carriers and the just, fair, reasonable and sufficient rates for common carriers should be the same when the service rendered the shipper is substantially the same."

The effective date of the order was March 1, 1936. Subsequently, the department, by order M. V. No. 22963, changed the effective date to April 1, 1936.

In contemplation of the provisions of chapter 184, Laws of 1935, p. 883, the plaintiffs are all "contract carriers," engaged in transporting, under contracts with particular persons, firms and corporations, commodities between certain fixed termini within the state. They carry no commodities other than those carried under their contracts.

By their complaint, plaintiffs sought an injunction against the enforcement of the order, on the ground that it and the law under which it was promulgated infringed their constitutional rights in the use of the highways.

Complaints in intervention were filed by the following: Inland Empire Dairy Association, a shipper who had a contract for hauling with one of the plaintiffs; Washington Motor Freight Association, a corporation whose members are all "common carriers," in contemplation of the provisions of the act; Henry A. Scandrett et al., trustees of the property of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Northern Pacific Railway Company, Great Northern Railway Company, Union Pacific Railroad Company and Spokane, Portland and Seattle Railway Company, all common carriers by railroad.

A hearing was had and a decree entered permanently enjoining the enforcement of order M. V. No. 22787.

We understand the decree to be predicated on the theory that the provisions of chapter 184, Laws of 1935,

p. 883, under which the order was promulgated, are unconstitutional; that the enforcement of the order would deny plaintiffs their constitutional guaranty of equal protection of law, impair the obligation of their contracts, and deprive them of their property without due process of law.

On the trial below, the following pertinent facts were developed: There are 3,797 miles in the state highway system, of which 1,151 miles are improved with high type paving, 1,908 miles paved with bituminous and oil mixes, 497 miles with graveled surface, thirty miles of bridges, and 211 miles unimproved. There has been spent on the state highway system $194,000,000, of which $170,000,000 has been laid out in permanent investment, and $24,000,000 in maintenance expenditures. Of the original cost, at least $25,000,000 could have been saved had construction been required to sustain only the traffic of private passenger cars. It has been necessary to build thicker and wider pavement to accommodate the transportation of persons and property by stages and trucks.

Classified as common carriers, there were, as of April 15, 1936, 4,087 trucks and 1,068 trailers. There were 179 trucks and 75 trailers classified as contract carriers. Classified as special carriers, there were 356 trucks and 153 trailers. Of privately owned and operated vehicles, there were 53,448 trucks and 3,059 trailers. It was further shown that contract haulers carried 3,000 tons per vehicle, compared to 1,500 tons per vehicle by common carriers. It also appears that the yearly gross ton miles per vehicle of the contract carrier is 216,000, as against 182,000 per vehicle of the common carrier.

In 1930, the total registration of passenger cars was 380,799; in 1935, 383,769. In 1930, the truck and trailer registration was 66,335; in 1935, 76,403. The increase

in terms of per cent was fifteen in the use of trucks, and less than one in the use of private passenger cars.

■■ Against this ever-increasing burden to which the highways are subjected, the states have, within constitutional limitations, been endeavoring to control and regulate traffic by persons using them for gain. Legislation designed to that end has fallen before constitutional limitations in various particulars. *Michigan Public Utilities Commission v. Duke,* 266 U. S. 570, 45 S. Ct. 191, 36 A. L. R. 1105; *Buck v. Kuykendall,* 267 U. S. 307, 45 S. Ct. 307, 38 A. L. R. 286; *Bush Co. v. Maloy,* 267 U. S. 317, 45 S. Ct. 326, 327; *Frost & Frost Trucking Co. v. Railroad Commission of California,* 271 U. S. 583, 46 S. Ct. 605, 47 A. L. R. 457; *Smith v. Cahoon,* 283 U. S. 553, 51 S. Ct. 582.

We shall not stop to analyze these cases, since they are analyzed and distinguished in *Stephenson v. Binford,* 287 U. S. 251, 53 S. Ct. 181, 87 A. L. R. 721, which we shall presently examine at greater length. It may be said in passing, however, that they all recognize the underlying principle that the use of the highways for gain is an extraordinary use which the state may prohibit or regulate. *Packard v. Banton,* 264 U. S. 140, 44 S. Ct. 257; *Bradley v. Public Utilities Commission of Ohio,* 289 U. S. 92, 53 S. Ct. 577, 85 A. L. R. 1131; *Stephenson v. Binford, supra.* In the latter case, the rule was stated as follows:

"It is well established law that the highways of the state are public property; that their primary and preferred use is for private purposes; and that their use for purposes of gain is special and extraordinary, which, generally at least, the legislature may prohibit or condition as it sees fit."

That case is so apposite in all its features to the case at bar that we shall refer to it at some length. In that case, the court had before it an act of the

forty-second legislature of Texas, dealing with the regulation of motor vehicles on rural highways. The act contained provisions similar to our own with reference to the power conferred on the department of public utilities to fix reasonable rates for common carriers and minimum rates for contract carriers. The attack on that act was predicated, we believe, upon all the grounds upon which our own is challenged in the instant case. In meeting the several objections to the act, the court, in part, said:

"We are of opinion that neither by specific provision or provisions, nor by the statute considered as a whole, is there an attempt to convert private contract carriers by motor into common carriers. Certainly, the statute does not say so. Common carriers by motor and private contract carriers are classified separately and subjected to distinctly separate provisions. By § 1 (h), the contract carrier is defined as 'any motor carrier . . . transporting property for compensation or hire over any highway in this state *other than as a common carrier.*' It is difficult to see how the legislature could more clearly have evinced an intention to avoid an attempt to convert the contract carrier into a common carrier. It is true that the regulations imposed upon the two classes are in some instances similar if not identical; but they are imposed upon each class considered by itself, and it does not follow that regulations appropriately imposed upon the business of a common carrier, may not also be appropriate to the business of a contract carrier. . . .

"What has just been said applies in the main to the other challenged provision authorizing the commission to prescribe minimum rates not less than those prescribed for common carriers for substantially the same service. This provision, by precluding the contract carriers from rendering service at rates under those charged by the railroad carriers, has a definite tendency to relieve the highways by diverting traffic from them to the railroads. The authority is limited

to the fixing of minimum rates. The contract carrier may not charge less than the rates so fixed, but is left free to charge as much more as he sees fit and can obtain. Undoubtedly, this interferes with the freedom of the parties to contract, but it is not such an interference as the Fourteenth Amendment forbids. While freedom of contract is the general rule, it is nevertheless not absolute but subject to a great variety of legitimate restraints, among which are such as are required for the safety and welfare of the state and its inhabitants. *Knoxville Iron Co. v. Harbison,* 183 U. S. 13, 22; *Atlantic Coast Line R. Co. v. Riverside Mills,* 219 U. S. 186, 202; *Chicago, B. & Quincy R. Co. v. McGuire, id.,* 549, 567, *et seq.; Baltimore & Ohio R. Co. v. Int. Com. Commn.,* 221 U. S. 612, 619. When the exercise of that freedom conflicts with the power and duty of the state to safeguard its property from injury and preserve it for those uses for which it was primarily designed, such freedom may be regulated and limited to the extent which reasonably may be necessary to carry the power and duty into effect. Compare *McLean v. Arkansas,* 211 U. S. 539, 545; *Miller v. Wilson,* 236 U. S. 373, 380; *Frisbie v. United States,* 157 U. S. 160, 165; *Highland v. Russell Car Co.,* 279 U. S. 253, 261; *Adkins v. Children's Hospital,* 261 U. S. 525, 546.

"Here the circumstance which justifies what otherwise might be an unconstitutional interference with the freedom of private contract is that the contract calls for a service, the performance of which contemplates the use of facilities belonging to the state; and it would be strange doctrine which, while recognizing the power of the state to regulate the use itself, would deny its power to regulate the contract so far as it contemplates the use. 'Contracts which relate to the use of the highways must be deemed to have been made in contemplation of the regulatory authority of the State.' . . .

"It may be said with like force that it belongs to the state, 'as master in its own house,' to prescribe the terms upon which persons will be permitted to contract in respect of the use of the public highways for purposes of gain . . .

"Nor does it matter that the legislation has the result of modifying or abrogating contracts already in effect. Such contracts are to be regarded as having been made subject to the future exercise of the constitutional power of the state."

Respondents say that the *Stephenson* case is not controlling because it upheld the Texas statute purely as a highway conservation measure, while order M. V. No. 22787 was bottomed solely on the power to provide for a stabilized service and rate structure. But we think there is sufficient in the record to hold, as did the court in the *Stephenson* case, that the order has a direct bearing upon the conservation of the highways. On this phase of the question, the court in that case said:

"Leaving out of consideration common carriers by trucks, impairment of the railway freight service, in the very nature of things, must result, to some degree, in adding to the burden imposed upon the highways. Or stated conversely, any diversion of traffic from the highways to the railroads must correspondingly relieve the former, and, therefore, contribute directly to their conservation. There is thus a substantial relation between the means here adopted and the end sought."

But, conceding that the distinction attempted to be made by respondents is sound, we have no hesitancy in holding that the transportation of property on the public highways for gain is a business affected with a public interest. And on this ground alone, the order is sustainable—authority to make it having been conferred by the act. It applies to all alike who are engaged in the business of transporting the commodities covered by the order.

It is not suggested that the rates fixed are unreasonable charges for the service rendered. While this question was expressly reserved in *Stephenson v. Bin-*

*ford, supra,* we think what was said in *Sproles v. Binford,* 286 U. S. 374, 52 S. Ct. 581, is highly pertinent.

"The State has a vital interest in the appropriate utilization of the railroads which serve its people, as well as in the proper maintenance of its highways as safe and convenient facilities. The State provides its highways and pays for their upkeep. Its people make railroad transportation possible by the payment of transportation charges. It cannot be said that the State is powerless to protect its highways from being subjected to excessive burdens when other means of transportation are available. The use of highways for truck transportation has its manifest convenience, but we perceive no constitutional ground for denying to the State the right to foster a fair distribution of traffic to the end that all necessary facilities should be maintained and that the public should not be inconvenienced by inordinate uses of its highways for purposes of gain. This is not a case of a denial of the use of the highways to one class of citizens as opposed to another, or of limitations having no appropriate relation to highway protection."

In any event, we think that our views on this aspect of the statute find ample support in *Munn v. Illinois,* 94 U. S. 113, and *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469. If warehousing of grain and distribution of milk are businesses affected with a public interest, we have no hesitancy in holding that the business of transporting property for hire over the public highways is also affected with a public interest.

There are two other points suggested, the first of which does not merit discussion. That is that the title of the act is not broad enough to sustain the power to fix minimum rates. It will suffice to say that we think it is. Authority for that conclusion is to be found in *State ex rel. Department of Public Works*

*v. Inland Forwarding Corp.,* 164 Wash. 412, 2 P. (2d) 888.

The other pertains to the apparent discrimination between those described as "contract carriers" in sub. (f) of § 2, p. 884, and "special carriers" described in sub. (g) of the same section. The order, M. V. 22787, does not apply to "special carriers." We think the distinction made with respect to special carriers is valid, since it is based upon the character of equipment used. See *Stephenson v. Binford, supra,* and *Sproles v. Binford, supra.*

The decree is reversed and the cause remanded, with directions to dismiss.

MILLARD, C. J., BEALS, MAIN, HOLCOMB, MITCHELL, STEINERT, and GERAGHTY, JJ., concur.

TOLMAN, J., dissents.

