MORGAN GUARANTY TRUST COMPA-
NY OF NEW YORK, Morgan Grenfell
& Co., Limited, The Bank of Tokyo
Limited, The Governor and Company
of the Bank of Scotland and Orion
Royal Bank, Limited, Plaintiffs,

v.

REPUBLIC OF PALAU, Defendant.

No. 86 Civ. 0590 (RWS).

United States District Court,
S.D. New York.

Jan. 29, 1988.

Jones, Day, Reavis & Pogue (Robert Lay-
ton, Barry R. Satine, of counsel), Wilson,
Elser, Moskowitz, Edelman & Dicker (Rob-
ert B. Wallace, of counsel), New York City,
for plaintiffs.

Reboul, MacMurray, Hewitt, Maynard &
Kristol (Wayne A. Cross, Stephen J. Riegel,
Stephen P. Falvey, of counsel), New York
City, for defendant.

## OPINION

SWEET, District Judge.

The Republic of Palau ("Palau") has
moved pursuant to Rules 12(b)(1) and
12(b)(6), Fed.R.Civ.Pro. to dismiss the ac-
tion asserted against it by plaintiffs Mor-
gan Guaranty Trust, Morgan Grenfell, the
Bank of Tokyo, the Bank of Scotland, and
Orion Royal Bank (collectively "the
Banks") on the ground that a joint resolu-
tion of Congress, enacted as Public Law
No. 99–658, § 104(e), 48 U.S.C. § 1681 note
(Supp.1987) (the "Joint Resolution") grants
Palau immunity from suit and thereby
strips this court of jurisdiction. Briefs
were submitted, and oral argument was
heard on the motion on December 11, 1987.
For the reasons set forth below, the motion
is denied.

*Facts*

The background of the recent history of
relations between Palau and the United
States and of the source of this litigation is
set forth in this court's opinions of July 10,

1986 and of April 7, 1987, familiarity with which is assumed. A brief statement of the facts particularly relevant to the instant motion is, however, in order.

In 1983, the Republic of Palau concluded an agreement with the British firm IPSECO International Power Systems Company, Ltd. ("IPSECO") whereby IPSECO would build a plant to generate electricity for Palau. To finance the project, Palau borrowed $24,128,745.12 from International Westminster Bank, PLC and $8,200,000 from County Bank Ltd. In executing the loan agreements, the president of Palau agreed to waive sovereign immunity. Following written assurances by officials of the United States Departments of State and the Interior to the British government that certain U.S. provided funds, including Compact monies, would be available to repay the Palauan debt, the Banks agreed to act as guarantors of these loans. They provided the guaranties to parties that financed or guaranteed the financing of the project, most notably the Export Credit Guaranty Department of the British government.

The plant was built although its performance was not deemed satisfactory to Palau. In March of 1985, the first payment on the loan came due, and Palau failed to meet this obligation. In accordance with their guaranty, the Banks thus paid the full amount of the debt plus interest. They initiated an action to recover the sums paid on December 17, 1985.

On November 14, 1986, Congress enacted the Joint Resolution. It approved the Compact of Free Association between the United States and the Republic of Palau (the "Compact"). The Compact—set forth as Title II to the resolution—will become effective upon the occurrence of certain formal conditions precedent as set forth at § 101(d). It provides for financial assistance from the United States, part of which is to be applied to Palau's energy needs. *See* § 211(a).

Also included in the Compact at § 174(a) is a prospective, mutual grant of sovereign immunity from the jurisdiction of the courts of each government. Section 104(e) of Title I of the Joint Resolution provides, however, that

[t]he provisions of section 174(a) of the Compact shall apply with respect to any action based on a contract or debt related to any electrical generating plant or related facilities entered into or incurred by Palau prior to the date of enactment of this joint resolution.

This measure, clearly aimed at the very action before this court, is intended to prevent the United States, through its Compact dollars, from absorbing the cost of the IPSECO power plant.

*Prior Proceedings*

This action was commenced by the Banks on December 17, 1985 in the Supreme Court of New York. On January 21, 1986, Palau removed this action to federal court pursuant to 28 U.S.C. §§ 1441, 1330 on the ground that Palau was a foreign state with removal jurisdiction in the federal district court. The Banks opposed removal on this ground. However, on July 10, 1986, this court held that Palau was a foreign state and was therefore entitled to assert this court's jurisdiction.

Thereafter, on October 24, 1986, the Banks moved to dismiss Palau's counterclaims, moved for judgment in their favor, and moved to strike the affirmative defenses of Palau. Palau had asserted, among other defenses, that it was immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, and that its President's agreement with the Banks was *ultra vires*. The parties requested and were granted additional time to submit supplemental documents and memoranda of law. The motion was fully submitted on December 16, 1986, more than one month after the Joint Resolution had become law.

On April 7, 1987, this court denied the Banks' motion for judgment in its favor but granted its motion for dismissal of Palau's counterclaims. In granting the Banks' motion to dismiss the affirmative defenses, this court held that it properly had jurisdiction over this action under the Foreign Sovereign Immunity Act. More-

over, it held that the President of Palau had acted within his statutory authority.

At no time while the motion was pending did either of the parties bring the Joint Resolution or its effect to the attention of the court, although each of the parties had undertaken extensive lobbying efforts on their respective sides of the issue. This matter was first brought to the court's attention by way of a letter from counsel for Palau dated November 24, 1987. Thereafter, Palau made the instant motion on December 11, 1987 to dismiss this action for want of subject matter jurisdiction on the basis of sovereign immunity.

*Discussion*

The parties focused initially on whether § 104(e) is presently effective or whether it will become law upon the effective date of the Compact. Palau has asserted, and this court agrees, that the structure of the Resolution makes it clear that the effectiveness of the Resolution is not conditioned upon the ultimate effectiveness of the Compact. For example, Title I of the Resolution is wholly separate from Title II which incorporates the text of the Compact. In fact, Title I states that "[a]ny references in the Joint Resolution to the 'Compact' shall be treated as a reference to the Compact of Free Association set forth in Title II of this joint resolution." § 101(b). Additionally, the provisions of Title I authorize a wide variety of executive action and expenditure which are clearly independent of the effectiveness of the Compact. For example, § 104(d) provides that "[n]ot later than one year after the date of enactment of this joint resolution," the Secretary of Agriculture must report on the feasibility and cost of restoring the fertility of the soil of the islands of Peleliu and Angaur. § 104(d). These provisions evidence an intent to make Title I and hence § 104(e) presently effective.

Moreover, regardless of the effective date, upon signing of the Compact it will be applied retroactively. Thus, any ruling this court issues could, if this law is applied, fail to be enforceable. *See de Rodulfa v. United States*, 461 F.2d 1240, 1252–53 (D.C.Cir.) (until action is finally disposed of, including appellate process, legislation may abate proceedings), *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). Therefore, of greater import to the disposition of this action are issues of sovereign immunity, of a sovereign's ability to waive that immunity, and of congressional authority to regrant immunity that has been at least facially waived thus abrogating private agreements and the assurances of the executive branch of government.

*Waiver of Sovereign Immunity*

■ Section 174(a) of the Compact provides that

"[t]he Government of Palau shall be immune from the jurisdiction of the courts of the United States, and the Government of the United states shall be immune from the jurisdiction of the courts of Palau."

According to Palau, this section, effective in this case through the operation of § 104(e) of the Joint Resolution, does not merely grant sovereign immunity but strips this court of subject matter jurisdiction. To bolster its argument, Palau points to draft versions of the legislation and the legislative history of the act.

According to the legislative history, the congressional motivation behind this section was the prevention of spending U.S. dollars on the failed power plant project. To accomplish this goal, Congress attempted to prevent the Banks from seeking federal funds in court. *See* H.R.Rep. No. 663, 99th Cong., 2d Sess. 11 (1986); 132 Cong. Rec. S15469 (daily ed. October 6, 1986) (remarks of Sen. McClure). In fact, an earlier House version of the bill provided that

[n]o party other than the Government of Palau or the Government of the United States shall have standing in any court of the United States, or any State, Territory, Commonwealth of the United States, or the District of Columbia ... by reason of any claim with respect to a contract or debt of such Government entered into or incurred prior to the date of enactment of this joint resolution.

H.R.Rep. No. 663, 99th Cong., 2d Sess. 8 (1986).

However, the House version never became law. Rather than enact a law that would prevent the Banks from enforcing their agreement in any court for reasons of justiciability, Congress granted both sovereigns the defense of immunity from suit. Contrary to Palau's argument, the statute enacted does not state that federal courts automatically cease to have jurisdiction, but that the Government of Palau will be immune from the jurisdiction the courts possess. Indeed, Congress' language must be construed in this fashion, or the legislation would be unconstitutional on its face, as is set forth below.

Reading the statute as a grant of immunity as opposed to a complete withdrawal of jurisdiction is supported by the plain language of the statute when compared with the Foreign Sovereign Immunities Act. That Act provides that

> [s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state *shall be immune from the jurisdiction of the courts of the United States* and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. The language granting immunity is identical to the language in § 104(e). Thus, it can be assumed that Congress intended a grant of sovereign immunity as opposed to a complete withdrawal of jurisdiction.

The history of the doctrine of foreign sovereign immunity is set forth succinctly in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). As the Supreme Court explained, the doctrine, applied from the early days of the republic, is not constitutionally mandated but is offered as a matter of grace and comity. The Foreign Sovereign Immunities Act, enacted in 1976, was intended to codify the then existing law, namely, the restrictive view that the doctrine applied only to the foreign sovereign's public acts and not to its commercial endeavors. It was enacted

as a matter of convenience, because before its passage the majority of cases involving foreign states had to be referred to the executive branch for a case-by-case determination as to whether immunity should apply.

Included in this codification of the doctrine are exemptions from immunity. These exemptions, for example where the case in question pertains to commercial activity or where immunity has been waived, were also a part of the existing law. *See* 28 U.S.C. § 1605; *Verlinden B.V., supra*, 461 U.S. at 488, 103 S.Ct. at 1968; *Dames & Moore v. Regan*, 453 U.S. 654, 684–85, 101 S.Ct. 2972, 2989–90, 69 L.Ed.2d 918 (1981). Only if none of the exemptions are applicable does the court lose all jurisdiction.

The Palauan Compact too contains an exception from immunity for prospective commercial activity. § 174(d).[1] Thus it can be inferred that, as in the Foreign Sovereign Immunities Act, jurisdiction is not entirely stripped but is only wanting if an exception to immunity does not apply. *See Dames & Moore, supra*, 453 U.S. at 685, 101 S.Ct. at 2989 ("No one would suggest that a determination of sovereign immunity divests the federal courts of 'jurisdiction.'"). In short, if the Compact is intended to echo the Foreign Sovereign Immunities Act treatment of sovereign immunity, which the language would suggest, then such immunity must be treated in accordance with the law codified under that Act. Since that Act codified a waivable defense, *see Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir.1984), so too is the defense under the Compact, in the absence of express language to the contrary, waivable. Therefore, as the defense of § 174(a) is waivable, the defense of § 104(e) is waivable as well.

■ Palau next contends that it has not waived its immunity because its President, in signing the loan agreements, did not have the authority to waive this defense. This court previously ruled that the Presi-

---

**1.** The commercial activity exception is part of the Compact and thus does not apply to the

Banks. However, it serves to illustrate the nature of the immunity granted.

dent's acts were not *ultra vires.* Having examined the law of Palau and held that the President had the authority to commit the funds of Palau to repayment of the loans, it would be inconsistent to hold at this time that he did not have the authority to assure that his commitment could be enforced. Thus, the defense of sovereign immunity granted by Congress under § 104(e) had already been waived by the Palauan government. In the context of this action, however, the issue remains as to whether the waiver was unknowing or the product of fraud.

### The Joint Resolution as a Violation of the Fifth Amendment

■ According to Palau's reading of section 104(e), Congress has enacted legislation that effectively deprives the Banks of the ability to enforce their agreement in federal court, nor can they enforce their agreement in state court since the foreign defendant can remove, and has removed, the action to federal court. Thus, it is the logical concomitant of Palau's contentions that Congress intended to leave the Banks with no alternative to enforce their agreement in the courts of the United States. This substantially alters the bargain the parties concluded when they included in their contract a waiver of sovereign immunity.

On the face of the Joint Resolution and its legislative history, absent the waiver construction just discussed, Palau would be correct in its interpretation. It is axiomatic that courts should avoid deciding cases on constitutional grounds when possible, *Ashwander v. TVA,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). However, the legislation at issue and the suggested interpretation of that legislation are so inextricably bound up with the question of the constitutionality of this exercise of congressional authority that a federal court would be derelict in its duty if it failed to address the issue. *C.f. Bartlett v. Bowen,* 816 F.2d 695, 703 (D.C.Cir.1987). This retroactive legislation abrogates private contractual rights, rights which were assured by the executive branch of the government, leaving an un-

certain path to the enforcement of those rights. This abrogation amounts to a congressional taking of property without just compensation and without due process of law. Thus, the legislation, if it is read as disallowing the waiver, must fail as violative of the Fifth Amendment to the United States Constitution.

In *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), the Supreme Court addressed the issue of whether Congress could enact legislation that would abrogate government war risk insurance contracts. In answering that question in the negative, the Court stated that

> The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.... That the contracts of war risk insurance were valid when made [in that Congress could authorize their making] is not questioned. ... [T]he due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power.

292 U.S. at 579, 54 S.Ct. at 843. The Court went on to hold that a "great need of economy" was not sufficient reason to invoke federal power, and that "[t]o abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *See also Highland v. Russell Car Co.,* 279 U.S. 253, 261–62, 49 S.Ct. 314, 316–17, 73 L.Ed. 688 (1929) (The right of people to "enter into and carry out contracts" is "protected by the due process clauses of the Fifth and Fourteenth Amendments." It may be abrogated if necessary to "effect any of the great purposes for which the national government was created," such as the protection of life, liberty, and property through the exercise of the nation's war powers.).

Here, the Banks and Palau had an agreement valid on its face. The contract was signed after negotiations between the parties, and after assurances of payment were

given by State and Interior Department officials. In short, the Banks had a vested property right in receiving the benefit of their bargain. *See, e.g., de Rodulfa, supra,* 461 F.2d at 1257. Under the due process clause of the Fifth Amendment, these vested rights may not be impaired lightly. *See, e.g., United States v. Larionoff,* 431 U.S. 864, 879, 97 S.Ct. 2150, 2159, 53 L.Ed.2d 48 (1977); *c.f. Forbes Pioneer Boat Line v. Board of Commissioners,* 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922) (examination of state legislation under Fourteenth Amendment). The legislation at issue here was not intended to promote any of this nation's paramount powers. It was only intended to prevent U.S. dollars from paying a bad debt and does not provide sufficient cause to abrogate the contract between the Banks and the Palauan government.

In enacting this legislation, one member of the Senate noted that Congress never voted to authorize the "powerplant arrangement." 132 Cong.Rec. S15469 (daily ed. October 6, 1986) (remarks of Sen. McClure). Thus, unlike the case in *Lynch,* where Congress had approved war risk insurance, no previous Congressional act exists here. Notwithstanding, this situation is analogous to *Lynch.*

First, State and Interior Department officials made written assurances to members of the government in Britain, the home of the first group of lenders, that certain portions of U.S. funds to Palau would be available for the powerplant project. The Banks relied on these assurances in deciding to guaranty the Palauan debt. Although the spending power belongs to Congress, the executive branch has long been active in matters of claims between foreign nations and United States nationals. For example, as noted above, prior to the enactment of the Foreign Sovereign Immunities Act, the executive branch was called upon to determine whether foreign countries would be amenable to United States court jurisdiction and thus answerable for claims asserted against them by United States citizens. *See, e.g., Dames & Moore, supra,* 453 U.S. at 683–84, 101 S.Ct. at 2988–89;

*Verlinden B.V., supra,* 461 U.S. at 486–88, 103 S.Ct. at 1967–69.

Additionally, the President has had the power to extinguish the claims of United States nationals against foreign sovereigns. That power was defined in the International Claims Settlement Act, 22 U.S.C. § 1621 *et seq.,* whereby funds received in an executive settlement with Yugoslavia were allocated to United States nationals, and whereby a procedure to distribute funds received from future settlements was created. As the Supreme Court has stated, by enacting the International Claims Settlement Act, "Congress has implicitly approved the practice of claim settlement by executive agreement." *Dames & Moore, supra,* 453 U.S. at 680, 101 S.Ct. at 2987.

Indeed, the executive branch position has been clearly stated in this case. In a November 30, 1987 message to Congress, President Reagan expressed his opposition to Congress' attempt to "strip" the courts of jurisdiction:

This attempt to grant Palau sovereign immunity for a single case relating to a power plant project is inconsistent with United States law and policy as embodied in the Foreign Sovereign Immunities Act of 1976. Repeal of this provision would protect the reputation of the United States as an international financial center and allow Palau and its creditors to pursue the rights and remedies available to them through the judicial process. Such repeal would also permit the routine application of the Foreign Sovereign Immunities Act. This would not in any way prejudge the matter, but merely enable the case to be heard in the courts of the United States.

In light of the powers of the executive branch, it is reasonable for the Banks to have relied on state and interior department assurances. Based on these assurances, as was the case in *Lynch,* the contracts here were, in part, obligations undertaken upon reliance upon United States assurance.

Moreover, although Congress did not enact legislation guarantying the obligation

between the Banks and Palau, it did enact the Foreign Sovereign Immunities Act. It thereby legislatively granted the Banks the right to enforce any commercial agreement it entered into with a foreign nation. Thus, in a sense, the Banks' right to an enforceable contract with Palau was sanctioned by Congress.

■ Contrary to the effect of the Joint Resolution urged by Palau, it might be said that Congress did not intend to impair the Banks' rights but only intended to withdraw a federal court remedy. *See Lynch, supra,* 292 U.S. at 586, 54 S.Ct. at 846. This may be argued to be within Congress' Article III, section 2 power to regulate the jurisdiction of federal courts. *See, e.g., Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869). However, Congress may not use its power to control jurisdiction as an indirect means to impair rights.

As the Supreme Court has noted in a similar situation,

> If the Congress did not have the authority to deal by a curative statute with the taxpayers' asserted substantive right, in the circumstances described, it could not be concluded that the Congress could accomplish the same result by denying to the taxpayers all remedy both as against the United States and also as against the one who committed the wrong.

*Graham & Foster v. Goodcell,* 282 U.S. 409, 431, 51 S.Ct. 186, 194, 75 L.Ed. 415 (1931); *see also de Rodulfa, supra,* 461 F.2d at 1257. Here, the right and the remedy are so interconnected that to deny enforcement in United States courts is, effectively, to deny the right.

Further, the right to enforce a contract has itself been deemed a property right. In *Marschalk Co. v. Iran National Airlines Corp.,* 518 F.Supp. 69, 93 (S.D.N.Y. 1981), one judge in this district held that

> extinguishing [the plaintiff's] right to enforce its contract claim ... in the United States courts constituted a taking. Valid contracts ... and the rights arising out of such contracts are property and protected by the Fifth Amendment.... When the right to enforce a contract in the United States courts is taken away or

materially lessened, the contract and the rights thereunder are taken within the meaning of the Constitution.

That case, arising out of President Carter's executive order extinguishing claims against Iran in the wake of the hostage crisis, was ultimately reversed by the Supreme Court on other grounds. *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

In *Dames & Moore,* the Court expressed no opinion whether the suspension of claims constituted a taking in violation of the fifth amendment, finding that question not ripe for review. However, the Court made that determination in light of its answer to a preliminary question. It determined that the plaintiff was not barred from asserting its rights under the Tucker Act, 28 U.S.C. § 1491, an Act that grants jurisdiction in the Court of Claims for claims against the United States based on "the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." Since the petitioner had yet to bring an action in the Court of Claims where it could be compensated for any taking that might of occurred, the court determined that a decision on whether property had been taken in violation of the fifth amendment was premature.

That the petitioners in *Dames & Moore* had an alternative forum in the Court of Claims is an important distinguishing factor. In general, legislation that effects a taking will not be held unconstitutional because there is usually some forum in which an injured party can assert his claim, such as the Court of Claims under the Tucker Act. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Bartlett v. Bowen,* 816 F.2d 695 (D.C.Cir.1987). However, in this case, the Banks, in the absence of waiver, are without the recourse for which they bargained.

Finally, the Banks cannot assert a takings claim against the United States in the Court of Claims under the Tucker Act. 28 U.S.C. § 1502 provides that

Except as otherwise provided by Act of Congress, the United States Claims Court shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations.

Since the Banks would not have a claim against the United States but for the compact provision granting sovereign immunity, the Banks are effectively denied access to the Court of Claims. *See, e.g., Hughes Aircraft Co. v. United States,* 534 F.2d 889, 209 Ct.Cl. 446 (1976). Thus, since the legislation leaves the Banks without access to any tribunal where they can be assured of the enforcement of their contract rights, the legislation must fail.

Congress' power under Article III does not save this legislation with respect to its inapplicability to this action. There has been much scholarly debate regarding the scope of Congress' power to regulate federal court jurisdiction. *See, e.g.,* H. Hart & H. Wechsler, The Federal Courts and the Federal System 336–38 (P. Bator, D. Shapiro, P. Mishkin, & H. Wechsler eds., 2d ed. 1973); Clinton, A Mandatory View of Federal Court Jurisdiction: Early Implementation of and Departures From the Constitutional Plan, 86 Colum.L.Rev. 1515 (1986). "However, most scholars agree that 'under the due process clause of the fifth amendment Congress may not exercise Article III power over the jurisdiction of the [federal] courts in order to deprive a party of a right created by the Constitution.'" *Bartlett v. Bowen, supra,* 816 F.2d at 705 (quoting J. Nowak, R. Rotunda & J. Young, Constitutional Law 41 (3d ed. 1986)). Thus, as this Circuit stated in *Battaglia v. General Motors,* 169 F.2d 254, 257 (2d Cir.), *cert. denied,* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948), "if one of [the] effects [of legislation depriving a court of jurisdiction] would be to deprive the appellant of property without due process or just compensation, it would be invalid." *See also United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872).

In this case, the effect of the legislation is to deprive the Banks of their contractual rights—property—for the public purpose of reducing the risk that federal dollars will pay the Palauan debt. Moreover, the net effect of the law is to prevent the Banks from asserting their constitutionally protected property interest or the question of whether a taking has occurred in any American court. As the Circuit Court for the District of Columbia has noted

[A] statutory provision precluding *all* judicial review of constitutional issues removes from the courts an essential judicial function under our implied constitutional mandate of separation of powers, and deprives an individual of an independent forum for the adjudication of a claim of constitutional right. We have little doubt that such a "limitation on the jurisdiction of *both* state and federal court to review the constitutionality of federal legislation ... would be '[an] unconstitutional' infringement of due process."

*Bartlett, supra,* 816 F.2d at 703 (quoting M. Redish, Federal Jurisdiction: Tensions in the Allocation of Judicial Power 27 (1980)).

## CONCLUSIONS

In sum, if the Joint Resolution is read as Palau proposes, thus precluding all American judicial review, it must fail as it works a deprivation of property without just compensation and without due process of law. However, since it is a court's duty to interpret legislation with "'[e]very possible presumption ... in favor of [its] validity,'" *Federal Housing Administration v. The Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) (quoting *The Sinking–Fund Cases,* 99 U.S. (9 Otto) 700, 718, 25 L.Ed. 496 (1878)). With this duty in mind, the legislation is construed as creating a waivable sovereign immunity defense to jurisdiction and not as a total withdrawal of jurisdiction. Only under this reading is constitutional injustice avoided.

For the foregoing reasons, Palau's motions pursuant to Rules 12(b)(1) and 12(b)(6) are denied. The parties will attend a pretrial conference as directed by the court.

IT IS SO ORDERED.