**HENDERSON, Adm'r, Office of Price Administration, v. BRYAN et al.**

**No. 2127–BH.**

District Court, S. D. California, Central Division.

Aug. 20, 1942.

Talbot Smith, Chief, Civil Litigation Unit Office of Price Administration, of Washington, D. C., Francis Carroll, Atty., Office of Price Administration, of San Francisco, Cal., John J. Ford, State Enforcement Atty. Office of Price Administration, of Los Angeles, Cal., James E. Harrington and George R. Maury, Sp. Assts. to Atty. Gen., both of Los Angeles, Cal., for plaintiff.

William Ellis Lady and Webster Hazlehurst, both of Los Angeles, Cal., for defendants.

HARRISON, District Judge.

In this action plaintiff seeks to enjoin the above named defendants from the selling of rubber tires and tubes to consumers without tire rationing certificates, contrary to the tire rationing regulations (Dec. 27, 1941, to date). See 6 F.R. 6406, 6 F.R. 6792, 6 F.R. 6795, 7 F.R. 925, 7 F.R. 72, 7 F.R. 1027, 7 F.R. 1089.

After December 10, 1941, when regulations were promulgated concerning new tires and tubes, the defendant Bryan, a tire dealer, continued to sell in large quantities new tires and tubes, and recapped and retreaded tires, to consumers at large during a period of seventeen days when no sales at all were permitted and later, after rationing was instituted, without requiring certificates of local tire rationing boards. He also failed to keep the required files and records.

These activities were temporarily restrained by the court and a preliminary injunction was thereafter issued.

At the pre-trial hearing, counsel for defendants stipulated that the factual allegations in the complaint were true, and thus rendered a trial upon the facts unnecessary, consequently, the court is confronted solely with the legal issues involved.

Defendants challenge the constitutionality of the tire rationing regulations, and urge that in their application they effect a taking of property without due process of law and without just or any compensation contrary to the Fifth Amendment.

In other words, the defendants contend that they are entitled to do business as usual and that the government is powerless in time of war to preserve and make available strategic material necessary for the country's war efforts by the methods under attack.

The program of rationing tires unquestionably works a temporary hardship on the defendants. This war we are engaged in works many hardships. War and hardships travel hand in hand and like death are no respecters of persons, in fact, financial hardships represent one of the milder aspects of war.

It is recognized that the exercise of the war powers by Congress is subject to applicable provisions of the Constitution including the guarantees of the Fifth Amendment. (United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Highland v. Russell Car & Snowplow Co., 279 U.S. 253, 261, 49 S.Ct. 314, 73 L.Ed. 688); and that an order or regulation made by an officer or agency of the government and providing for the punishment for violations must be strictly construed (Matthew Addy Co. v. United States, 264 U.S. 239, 44 S.Ct. 300, 68 L.Ed. 658) and I approach the subject at hand in recognition thereof.

Defendants chiefly rely on the case of United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 355, 47 L.Ed. 539. Land belonging to the plaintiff had been virtually flooded as a result of the construction of certain dams, etc., across the Savannah River, which raised the river's level. The plaintiff claimed compensation therefor and the Supreme Court (in applying the Fifth Amendment, and not in any wise deciding the constitutionality of any law) stated:

"All private property is held subject to the necessities of government. The right of eminent domain underlies all such rights of property. The government may take personal or real property whenever its necessities, or the exigencies of the occasion, demand. So, the contention that the government had a paramount right to appropriate this property may be conceded, but the Constitution in the 5th Amendment guarantees that when this governmental right of appropriation—this asserted paramount right—is exercised it shall be attended by compensation. * * *

"Whenever in the exercise of its governmental rights it takes property the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor."

Nowhere have the defendants claimed compensation, or any right to payment under the implied promise, even if I assume momentarily, for the purpose of this discussion, that there has been a taking of property.

█ The defendants assert that the Acts, Executive Orders, and Administrative Orders, etc., by which tires are rationed (see supra), are void under the Fifth Amendment in that they fail to make any provision for compensation for the alleged taking of their property. The fallacy of this argument is shown by the very language of the Lynah case: If there has been a taking, then, under the Fifth Amendment and the Lynah case, the government has impliedly promised to pay therefor, and the defendants have their remedy.

This situation differs from the Lynah case. For seventeen days the defendant Bryan, like all other tire dealers, was forbidden to sell new rubber tires and tubes (6 F.R. 6406). Thereafter, he was permitted to sell new tires and tubes to anyone who had a rationing board certificate (6 F.R. 6792, 6 F.R. 6795, 7 F.R. 72, 7 F.R. 1027, 7 F.R. 1089). Recapped and retreaded tires were unaffected until February 19, 1942 (7 F.R. 95, 7 F.R. 1027, 7 F.R. 1089), when similar restrictions were placed upon them.

Here, it is to be observed, no tires, tubes, or any other properties have been taken from Bryan. He still has (or would have ir he had not sold them in defiance of the regulations) all of his tires, less those which he may have sold in obedience to the regulations and for which he received rationing certificates. In fact, under the law there has been no taking of defendants' property, simply a regulation for its disposition. The contentions of the defendants are similar to the contentions advanced during the last war under the Lever Act, 40 Stat. 276, as amended. Morrisdale Coal Co. v. United States, 259 U.S. 188, 42 S.Ct. 481, 66 L.Ed. 892; Pine Hill Coal Company, Inc., v. United States, 259 U.S. 191, 42 S.Ct. 482, 66 L. Ed. 894; General Chemical Co. v. United States, 57 Ct.Cl. 94.

█ In 1869, in the second "legal tender" case, Knox v. Lee (Parker v. Davis), 12 Wall. 457, 551, 20 L.Ed. 287, the court said: "Closely allied to the objection we have just been considering is the argument pressed upon us that the legal tender acts were prohibited by the spirit of the fifth amendment, which forbids taking private property for public use without just compensation or due process of law. That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared?" (Underscoring supplied)

█ We can notice judicially that a state of war exists. Stephens v. United States, 9 Cir., 261 F. 590; Hamm v. United States, 9 Cir., 261 F. 907; Bouldin v. United States, 5 Cir., 261 F. 674; Weisman v. United States, 7 Cir., 271 F. 944. Congress, however, can invoke the War Power (Constitution, Art. I, Sec. 8, Cls. 11–16) during times of peace, for the future protection of the nation. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688.

On May 31, 1941, an amendment to an Act approved June 28, 1940, entitled "An Act to. expedite national defense, and for other purposes" [54 Stat. 676; 41 U.S.C.A., preceding Section 1 note] became effective [Public Law 89, 77th Congress, Chapter 157, 1st Session; 55 Stat. 236].

This, among other things, provided: "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material for defense or for private account or for export, the President may allocate such material in such manner and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense. The President shall be entitled to obtain such information from, require such reports by, and make such inspection of the premises of, any person, firm, or corporation as may be necessary or appropriate, in his discretion, to the enforcement or administration of the provisions of this section. No person, firm, or corporation shall be held liable for damages or penalties for any default under any contract or order which shall result directly or indirectly from his compliance with

any rule, regulation, or order issued under this section. The President may exercise any power, authority, or discretion conferred on him by this section, through such department, agency, or officer of the Government as he may direct and in conformity with any rules and regulations which he may prescribe."

Under this amendment and under the Act thereby amended, the President has created variously the Office of Production Management (Exec. Order 8629, 6 F.R. 191); within it, the Office of Price Administration and Civilian Supply (Exec. Order 8734, 6 F.R. 1917), which later became the Office of Price Administration (Exec. Order 8875, 6 F.R. 4483); later the President created the War Production Board (Exec. Order 9024, 7 F.R. 329) to which were transferred all the powers of OPM (Exec. Order 9040, 7 F.R. 527) on January 24, 1942, and which immediately, with the President's written approval, granted to OPA the authority to exercise the powers and duties which had been conferred upon the President by Congress with respect to rationing materials, including rubber and the like (Directive No. 1, 7 F.R. 562).

Thus we find that the power to allocate or ration any material was reposed in the President, or some duly constituted department, agency, or officer of the government from May 31, 1941, on. The validity of this specific repository power in the President and his subalterns has been upheld by the United States District Court, E. D. Virginia, in Henderson, Administrator, Office of Price Administration, v. Smith-Douglass Co., Inc., 44 F.Supp. 681, on March 6, 1942, and by the Circuit Court of Appeals, Fifth Circuit in Standard Oil Co. v. Angle, 128 F.2d 728, decided June 9, 1942, beside the earlier rulings of this court in the criminal case of United States v. Bryan et al.[1] As was said in Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 351, 72 L.Ed. 624, quoting the Supreme Court of Ohio in Cincinnati, W. & Z. R. Co. v. Clinton County Commissioners, 1 Ohio St. 77, 88: "The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

In Standard Oil Co. v. Angle, supra, [128 F.2d 730], the Court aptly said: "We do not think that this will at all do. The purpose of the 'freezing' regulations was comprehensively and completely to fix the status of the tires they dealt with and prevent a change of that status except in accordance with the regulations. No claim is made here by the appellee which in any wise impairs appellant's title to or looks at all to taking his property in the tires. All that appellee, an agent of the government, has done or proposes to do is, in compliance with the regulation and the orders of the Office of Price Administration, to withhold delivery of the tires until they are released in accordance therewith, and appellant's apprehensions that its property is about to be or will be confiscated by the action of the collector as confirmed by the judge, have no sounder foundation to rest upon than would the apprehensions of any other person whose tires are frozen, that its property is to be, or is thereby, taken without compensation."

The cases are reviewed in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. In Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406, authority was conferred by Congress upon the Federal Radio Commission to make allocations and assignments in order to secure an equitable adjustment in the distribution of facilities.

In Highland v. Russell Car & Snowplow Co., 279 U.S. 253, 49 S.Ct. 314, 316, 73 L.Ed. 688, an action arising out of the President's fixing certain prices under special war powers granted to him by Congress, the Court said:

"The Lever Act was broader than its predecessors. It was passed to encourage production, conserve supply, and control distribution of foods, fuel, and many other things deemed necessary to carry on the war. Hoarding, waste, and manipulations for the enhancement of prices were condemned. The President was empowered to license and regulate production, prices and sales, to requisition coal and other necessaries, to purchase and sell wheat, flour, and other staple articles of food, and to take over and operate factories and mines. * * *

"It is everywhere recognized that the freedom of the people to enter into and carry out contracts in respect of their property

---

[1] No opinion for publication.

and private affairs is a matter of great public concern and that such liberty may not lightly be impaired. [citing] Generally speaking, that right is protected by the due process clauses of the Fifth and Fourteenth Amendments. [citing] It is also well established by the decisions of this court that such liberty is not absolute or universal and that Congress may regulate the making and performance of such contracts whenever reasonably necessary to effect any of the great purposes for which the national government was created. [citing]

"Under the Constitution and subject to the safeguards there set for the protection of life, liberty and property [citing], the Congress and the President exert the war power of the nation, and they have wide discretion as to the means to be employed successfully to carry on. [citing] The measures here challenged are supported by a strong presumption of validity, and they may not be set aside unless clearly shown to be arbitrary and repugnant to the Constitution. [citing] The principal purpose of the Lever Act was to enable the President to provide food, fuel, and other things necessary to prosecute the war without exposing the government to unreasonable exactions. The authorization of the President to prescribe prices and also to requisition mines and their output made it manifest that, if adequate supplies of coal at just prices could not be obtained by negotiation and price regulation, expropriation would follow. * * *

"As applied to the coal in question, the statute and executive orders were not so clearly unreasonable and arbitrary as to require them to be held repugnant to the due process clause of the Fifth Amendment."

■ In this war, the President has been given certain powers by Congress. To effect them, the President has utilized other agencies than himself, as he is unquestionably empowered to do. Williams v. United States, 1 How. 290, 42 U.S. 290, 11 L.Ed. 135.

Among the powers granted are the power to allocate material—"any material"—and to obtain information, require reports, and make inspections.

The obvious purpose of the Administrative rules and regulations is to conserve our national stock pile of rubber to the end that our military forces shall have all they need and that our war economy shall not suffer unduly from a rubber shortage, so far as this is possible.

■ The Tire Rationing Regulations Revised (7 F.R. 1027) (as amended, 7 F.R. 1089) are reasonably apt to accomplish the end sought. The same restrictions are placed upon all dealers in tires, and retail sales are permitted only to classes of consumers which are by the Office of Price Administration considered essential to the war economy. Such sales are made then only after an examination of the status of each purchaser by a local rationing board. Quotas are established for various districts. These regulations, coupled with price control, comprise a system whereby rubber and tires may be distributed in such manner as to provide for military needs and necessary civilian uses, at reasonable prices, as long as our rubber supply lasts. They reasonably tend to prevent hoarding, waste, and profiteering, in a material absolutely essential to our defense. "The burden is on one attacking the legislative arrangement to negative every conceivable basis which might support it." Madden v. Com. of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 408, 84 L.Ed. 590, 125 A.L.R. 1383.

■ Substantially the same questions as considered here were raised in Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 108, 64 L.Ed. 194, and in Ruppert, Inc., v. Caffey, 251 U.S. 264, 302, 40 S.Ct. 141, 64 L.Ed. 260. On November 21, 1918, the President approved the War-Time Prohibition Act, 40 Stat. 1046. It was urged in the Hamilton case, among other things, that the Act was void when enacted because it violated the Fifth Amendment. In deciding this question, the court said: "That the United States lacks the police power, and that this was reserved to the states by the Tenth Amendment, is true. But it is none the less true that when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose. [citing] The war power of the United States, like its other powers and like the police power of the states, is subject to applicable constitutional limitations; [citing] but the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon

state power. [citing] If the nature and conditions of a restriction upon the use or disposition of property is such that a state could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation; for prohibition of the liquor traffic is conceded to be an appropriate means of increasing our war efficiency."

When our government has the authority to draft men into the armed forces of the country, it seems rather commonplace to say that the government cannot regulate the disposition of materials vital to our war efforts. To so hold would be to uphold the contentions of those who claim that our form of government is too cumbersome to meet the present emergency.

Former Chief Justice Hughes, in an address on "The Fighting Powers of the United States Under the Constitution" reported in 55 Cong.Rec. pt. 8, pp. 551-555, said: "The framers of the Constitution did not contrive an imposing spectacle of impotency. One of the objects of a 'more perfect union' was 'to provide for the common defense'. A nation which could not fight would be powerless to secure 'the blessings of liberty to ourselves and our posterity.' Self preservation is the first law of national life, and the Constitution provides the necessary powers in order to defend and preserve the United States. Otherwise, as Mr. Justice Story said, 'the country would be in danger of losing both its liberty and its sovereignty from its dread of investing the public councils with the power of defending it. He would be more willing to submit to foreign conquest than to domestic rule.' "

Concerning the limitations of this power by the Fifth Amendment, Mr. Hughes had this to say: "That power, explicitly conferred and absolutely essential to the safety of the Nation is not destroyed or impaired by any later provision of the Constitution, or by any one of the amendments. These may be all construed so as to avoid making the Constitution self-destructive, so as to preserve the rights of the citizen from unwarrantable attack, while assuring beyond all hazard, the common defense and the perpetuity of our liberties. They rest upon the preservation of the Nation."

In the case of Arver v. United States, 245 U.S. 366, 38 S.Ct. 159, 165, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856, an attack was made on the Selective Draft Act of 1917, 50 U.S.C.A. appendix, § 201 et seq., wherein it was contended that said act was in violation of the Constitutional guarantees. Chief Justice White, delivering the opinion of the Court, said: "Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation as the result of a war declared by the great representative body of the people can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement."

Paraphrasing the language of Chief Justice White, the contention of the defendants in the case at bar is refuted by its mere statement.

Judgment for the plaintiff as prayed for.